**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAY -8 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CRISTA E. NOEL,

                    Plaintiff,

vs.

BRUNO COLTRI,

                    Defendant.

No. 10cv08188
Honorable Judge **SARA L. ELLIS**

## PLAINTIFF'S MOTION IN SUPPORT OF JUDGE ELLIS' DECISION FOR SUMMARY JUDGMENT IN PART AND A MOTION TO RECONSIDER

NOW COMES Plaintiff, Crista E. Noel, Pro Se and non-moving party, with an amended instant memorandum of law in opposition to Defendant's Motion to Reconsider, and in support of the Honorable Judge Ellis' decision for Summary Judgment, states as follows:

I.      Introduction

Plaintiff greatly appreciates BRENDAN SHILLER of the Shiller, Preyar Law Offices for his pro bono assistance with Plaintiff's 42 USC 1983 case against Bruno Coltri. Additionally, Plaintiff stands by her previous arguments and motions to find Defendant's counsel in contempt of court, as they have continually "pushed the boundaries" of ethical behavior, ignored the Court's orders and rules, and bullied Plaintiff throughout this claim's entire process. Their rabidity is boundless. If it had not been for Shiller, Preyar Law Offices she would not have survived the onslaught of the Defendant's attorneys strategy to weaken her resolve; but God is good. And with renewed vigor, Plaintiff follows with her own arguments and understands that the arguments she is making may, or may not, be valid, but felt it was important that, at the very least, her interpretation of the law was presented.

II.      The Illinois Resisting Arrest Statute

(720 ILCS 5/31-1) Sec. 31-1. Resisting or obstructing a peace officer or correctional institution employee. (a) A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer or correctional institution employee of any authorized act within his official capacity commits a Class A misdemeanor.

A person being arrested, in turn, has no right to use force to resist an arrest by a known police officer even if the arrest is unlawful. (720 ILCS 5/7-7) This rule is qualified, however, in that it does not apply to a situation in which an officer uses excessive force. *People v. Williams, 267 Ill. App. 3d 82, 88, 640 N.E. 2d 981, 985-86, 203 Ill. Dec. 831 (1994).* The use of excessive force invokes the right to self defense. 720 ILCS 5/7-1(a) (west 2004) "A person is justified in the use

of force [*10] against another when and to the extent that *[s]he reasonably believes* that such conduct is necessary to defend [her]self against such other's use of imminent unlawful force." (720 ILCS 5/7-1(a) (West 2004)

### III.    Resisting Arrest and the Human Acute Stress Response

The freeze, fright, faint, flight or fight survival instinct kicks in whenever someone is in a high stress situation, for example, when a police officer puts you in a choke hold. You get tunnel vision. Your body shuts down the processes associated with digestion and rational thought, and your body ramps up the systems that will help you outrun the attacker or fight the home invader. When you are experiencing the human acute stress response sequence, it is not a cognitive rational decision to resist. It is not a choice. It is instinct. Although the autonomic nervous system and its sympathetic nervous system are customarily ignored, it is scientific fact.

### IV.    Does Heck Apply to the Resisting Arrest Statute's Unlawful Arrest Clause?

Heck v Humphrey was argued on April 18, 1994 and decided by the Supreme Court of the United States on June 24, 1994, most US States, amended their resisting arrest statutes to include,

"A person being arrested, in turn has no right to use force to resist an arrest by a known police officer, **even if the arrest is unlawful**. 720 ILCS 5/7-7 (West 2004)."

Plaintiff questions whether the decision in *Heck V Humphrey, 512 U.S. 477, 114 S. Ct. 2364. 129 Ed. 2d 383 (1994)*, was made when the resisting arrest statute included what should be found to be a violation of the 4th Amendment of the Constitution of the United States, which specifically states that no one can be arrested without probable cause, and therefore, no one should ever be convicted without probable cause, that is, unlawfully. The resisting arrest statute leaves this door open for review.

The Supreme Court's decision in *Heck* was based on the fact that no one could be convicted of a crime if it was unlawful. The resisting arrest statute, as it is determined, allows for an arrest to be unlawful, therefore it does  not require probable cause, therefore Heck does not apply to a conviction of an amended resisting arrest statute. It is a fact that Illinois amended its resisting arrest statute and a question of whether it was amended after June of 1994.

Indiana State's resisting arrest statute, which may or may not have been the same as the Illinois statute of resisting in 1994, was the statute in question during the Heck decision, and should be noted.

Finally, there is evidence that the resisting statute is abused by police. Professor Sam Walker, police accountability expert is quoted as saying;

"There's a widespread pattern in American policing where resisting arrest charges are used to sort of cover- and that phrase is used- the officer's use of force. "Why did the officer use force? Well, the person was resisting arrest." *5% of New York cops turn in 40% of "resisting arrest"*

*cases. Dara Lind, December 6, 2014, Vox*

Professor Samuel Walker supports Judge Ellis' summary judgment decision against Bruno Coltri as well.

        B.    Plaintiff reserved her right to self defense per the Illinois State Appellate Court decision and the Appellate Court abused its discretion in the standard of review.

> "Typically, the manifest weight of the evidence standard of review is used where the trial court below has made a factual determination in reaching its decision. **It is well settled that the trial court is in a far superior position to determine and weigh the credibility of witnesses, to observe their demeanor, and to resolve conflicts in testimony.**" *People v Carter, 288 Ill. App. 3d 658, 662, 683 N.E.2d 1215 (1997).*

> "When the determination of a defendant's guilt or innocence depends upon the credibility of the witnesses and the weight to be given to their testimony, **the reviewing court must defer to the fact finder and cannot substitute its judgment for that of the trier of fact**." *People v Robinson, 213 Ill. App. 3d 1021, 1025, 572 N.E.2d 1254, 1257 (1991).*

The Appellate court erred in its judgment of Judge Tucker's decision and opinion in the lower court when it controversially stated that Plaintiff actually "chest bumped" Bruno Coltri. The court overstepped their bounds in making their own judgment on the use of excessive force in light of its decision on Plaintiff's claim reserving her right to self defense, and Judge Tucker's acquittal on the aggravated battery charge.

Additionally, the Appellate court dismisses the human acute stress response and the Plaintiff's affirmative defense. Although it would have been a challenge to uphold the resisting conviction without substituting their opinion for Judge Tucker's, there was a less destructive argument, i.e., Officer's Newton's claim; or that Plaintiff leaned back against Coltri; that the Appellate Court could have made to uphold the resisting conviction. It was unnecessary to smear Plaintiff's name and reputation, for the rest of her life, for the public's view when Googling her name.

Additionally, Judge Tucker could have convicted the Plaintiff on simple battery but did not. It is clear that he did not believe there was any instance of battery to Coltri or Plaintiff would have been convicted of a lesser charge and imprisoned. Plaintiff was given a non-reporting conditional discharge; the closest sentence to supervision Judge Tucker could give under the resisting's statute.

Defendant relies heavily on a frowned upon Appellate court judgment in opposition of the trier of fact determined in the District court.

VI.    Excessive Force

Plaintiff argues she defended herself and reserved the right to prove if Bruno Coltri used excessive force. Excessive force is a federal claim and therefore should be determined by this Court. Plaintiff points out that the Appellate Court is only guessing at what occurred on January 1, 2009, and only the Plaintiff has the preponderance of written, (and lack thereof), spoken, and photographic evidence to prove that she was the attacked on that date. Coltri has only his testimony. No other witness supports Coltri's claim of physical attack.

As stated by her attorney, the reasons Judge Tucker decided to convict her on the resisting arrest charge could be many. But none was based on Coltri's testimony because Judge Tucker dismissed Coltri as an incredible and unreliable witness in his decision.

In Coltri's own testimony he states that "Plaintiff (A) then ***got close enough*** to chest bump Coltri (C)." Advised that at this time, he tried to take (A) into custody at which time she resisted." (Narrative/Supplemental Police Report signed by Sergeant LaManna.) This statement was taken less than two hours after the incident, while a kernel truth was unavoidably fresh in Coltri's memory, that is, no "chest bump" occurred.

Plaintiff states for the record that Coltri's statement should be considered under the 80/20 rule. Eighty percent of his statement is fabrication and 20 percent is truth.

Coltri does not state that he told Plaintiff she was under arrest, Coltri does not state that he was actually "chest bumped." But he does allude to the fact that without a "chest bump" he immediately, without warning, "tried to take Plaintiff into custody." Explained further in trial court that, "I attempted ***to grab*** one of her hands…" Which Plaintiff described as,

> "And when he came towards me, I saw his fist come around, and at that point he came over to me, and I guess he slammed into me because I had a bruise on my leg. The next thing I know – let me take my glasses off. He had his arm around my face like this, and I said: Oh, my God, you know. And he smashed the glasses to my face…I said: Oh my God, he is trying to put me in a choke hold*." (TT, Exhibit B, pages 80, lines 10-14, page 81 lines 1-14)*. (Correction to the narrative, Plaintiff never testified to being swung at by Coltri. Specifically, as above, she states, his first came around; he slammed into her; and tried to put her in a choke hold.)

The Westchester Police Department's Supplemental/Narrative of January 1, 2009, excludes the EMT's arrival and report taken at 3:15p, although it includes the Miranda reading at 4:10p and the States Attorney's felony approval at 4:32pm; suggesting a minimum of a cover up of EMT's call and the documentation of Plaintiff's statement that she was attacked by Coltri.

Plaintiff argues that the Defense uses Coltri's testimony of what she allegedly said to strengthen their argument that some type of outrageous physical attack occurred. She believes that the alleged verbal "attack" is part and parcel to the alleged physical attack. And that in defense of Coltri, the two cannot be separated, nor have they been in any defending narrative recounting the incident since its occurrence.

If one decision was made without the mentioning of Plaintiff's alleged statements, or her challenge to Coltri's interpretation of law, then it could be argued that it was not considered a determining factor in her resisting conviction, but since that is not the case, it cannot be dismissed as de minimis.

Implicit bias, and its application in lieu of law, runs wild in the State's judicial system.

VII.    Equal Protection, Hate Crime, and Illegal Seizure

Equal Protection and Hate Crime

A.    The Honorable Judge Tucker determined that Bruno Coltri was an incredible witness and therefore found in favor of Plaintiff in regards to her "using her chest [breast] as weapons" against him. (TT, Exhibit B, Page N-23, Lines 21-24). Plaintiff argues that this masculinization of African descended women is integral in the stereotyping of American women of African descent. Additionally, cussing, being sarcastic, and angry in every situation, no matter if it is an appropriate emotional response, provoked, induced, deserved, or accurate, continues the dehumanization and othering of African people by society as a whole. Recently, and important to this case is the exceptional dehumanization of African descended people found in a study by the University of Virginia on the treatment of pain:

> "…this work reveals that a substantial number of white laypeople and medical students and residents hold false beliefs about biological differences between Blacks and Whites and demonstrates that these beliefs predict racial bias in pain perception and treatment recommendation accuracy. It also provides the first evidence that racial bias in pain perception is associated with racial bias in pain treatment recommendations. Taken together this work provides evidence that false beliefs about biological differences between Black and Whites continue to shape the way we perceive and treat Black people-they are associated with racial disparities in pain assessment and treatment recommendations." Racial bias in pain assessment and treatment recommendations, and false beliefs about biological differences between blacks and whites. Kelly M. Hoffman, Sophie Trawalte, Jordan R. Axt, and M. Norman Oliver, April 2016, ncbi.nim.nih.gov

Plaintiff argues that being an African American is not the only facet of her existence that is protected under the Equal Protection statute, she includes being a woman -- her gender is protected, and states for the record that this attack was, at its foundation, an intersected manifestation of gender based violence against women of color. She has been objectified and reduced to her breast and her mouth, and allegedly what came out of it.

Power and control, which is fundamental to gender based violence, along with the need to force a woman into a subordinate position through violence, was at the core of Coltri's escalation and attack. Plaintiff continues to state that the only thing she did was ask a simple question of Coltri, a factor in being human, but additionally a characteristic of being a verbal, educated, and intelligent woman. Plaintiff sincerely asked, "Are you writing me a ticket?" Which should be interpreted as, "Am I free to go?" A simple yes or no answer from Coltri would have sufficed.

> *"Like many...cases [municipalities] effectively grant[s] police the discretion to make arrests selectively on the basis of the content of the speech. Such discretion is particularly repugnant given 'the eternal temptation...to arrest the speaker, rather than to correct the conditions about which [s]he complains."* <u>Younger v Harris, 401 U.S. 37, 401 U.S. 65 (1971)</u>

Defendant's entire case centers on Coltri's incredulous testimony that Plaintiff could not speak a sentence without repetitively cussing at him, and this act, combined with his testimony of her being sarcastic; out of control with anger for no good reason; using, his interpretation, of "Black dialect;" and the masculinization of her body, is so littered with racial indignity that it should be determined to be a Hate Crime, or at the very least racial profiling; two of Plaintiff's original claims.

Finally, Coltri's painting of a stereotype did not hold water when it was revealed that Plaintiff was a 49 year old graduate of Northwestern University, a second level manager, at a Fortune 10 company, and a more intelligent and determined human being than he, or his attorneys, could have ever fathomed.

<u>Illegal Seizure</u>

B.     Bruno Coltri had no reasonable suspicion or probable cause to seize Plaintiff, and her car/property, by blocking her vehicle in the lot. Was Plaintiff free to go? Was it reasonable to think she could walk away from an officer who had previously hollered at her; threatened to write her a ticket; followed her around the corner after she submitted to his authority and obeyed his directive to park around the corner; and then placed his car in a position that she would have to drive towards him to exit the lot? Are there not cases of individuals being shot and killed while driving towards police officers, as well as, away from them, and sitting in their cars? Are there not cases of individuals being shot while walking away or running from police officers? Was Plaintiff safe anywhere after Coltri decided to follow her around the corner? How many cases of "excessive force" begin with a simple incident that was not criminal in any way, but ends in an officer following the victim, for reasons known only to him, and ending in "excessive force," including fatal.

When Coltri stated his reason for running Plaintiff's plates while sitting and blocking the entrance/exit of the parking lot, he articulated his intent was,

> *"I wanted to know who the car belonged to and who I was talking with"*
> (TT, Exhibit B, pages N-14, Lines 14-15)

Additionally when asked if his car was blocking Plaintiff, he testified, after being presented with photographic evidence,

> Q. *Does that truly and accurately depict the way your car was parked on January 1, 2009, when you were arresting Miss Noel?*
> A. *Yes, sir, it is.*
> Q. *So you are blocking the exit to the parking lot for Miss Noel to go back out into the*

*street, is that correct?*
*A. If Ms. Noel was trying to move her car from the lot, my squad would have been blocking hers."* (TT, Exhibit B, page N-22, Lines 4-14)

Plaintiff testified,

> *"I pulled into the mall, and realized, well, when I was going south, I realized that Pam was facing east, and I was getting ready to drive into a neighborhood. I didn't know where I was, so I said, okay, pull into this parking lot, and I was going to three point [turn] and come back out when I saw that Officer Coltri had blocked the entrance to the parking lot. ...I was going to pull out and park on the side street so when Pam headed east, I could make a right and turn behind her."*(TT, Exhibit B, N-76, Lines 6-18)

Pamela Tolbert testified at trial,

> *A. Officer Colti followed Cris in the direction of the lot, and he pulled his car into the entranceway of that parking lot where Cris was.*
> *Q. If you know would his car have been blocking the exit to the parking lot?*
> *A. Yes, his car was."(*TT, Exhibit B, N-43, Lines 3-18)

Three witnesses, including Coltri, testified that Plaintiff's vehicle was blocked in the lot.

Additionally, instead of Coltri simply answering yes or no to the question of blocking the Plaintiff in the lot, he specifically states, "If Miss Noel *was trying to move her car from the lot, my squad would have been blocking hers.*" As if he witnessed Plaintiff attempting her 3-point-turn and intentionally placed his car in such a way that he would block her car from exiting the parking lot; conveniently allowing him to run her plates while she was seized.

Conclusively, if there is any question of Coltri's intent to seize/ stop Plaintiff, she notes for the record that Coltri has on several occasions referred to his encounter with Plaintiff as a "stop."

At Preliminary hearing Coltri testifies:

> *Q. Now, you stated that you were there backing up Officer Newton, is that correct?*
> *A. Yes, sir, I was*
> *Q. And this was a traffic stop of an unrelated matter that Officer Newton was handling is that correct?*
> *A. His traffic stop was unrelated to mine.* (Prelim. Hearing Transcript, pg A-10, line 7)

There was only one place that Coltri "stopped" Plaintiff and that was at the parking lot.

Beyond any doubt, Coltri's articulated intent for blocking Plaintiff in the lot and running her plates fails to establish the requirements of reasonable suspicion. That is, that Plaintiff was committing, had committed, or was about to commit a criminal offense. Coltri simply stated he wanted to know who he was talking to and who owned the vehicle, which, as articulated, is an

illegal seizure. Police officers are not allowed to seize individuals and their property/vehicles because they want to know who they are, or who owns the car. The law forbids this behavior, although it is an essential factor in racial profiling.

### C. Malicious Prosecution and False Arrest/Imprisonment

Plaintiff supports her Honors determination of malicious prosecution because it is not only precise, it is affirming, refreshing, and a psychological relief to know that someone, anyone, is analyzing a case bringing justice to a victim of a violent crime. Coltri's violence did not end with the physical and emotional attack that occurred on January 1, 2009, his insidious behavior and intentional violation of Plaintiff's civil rights lead her on a journey of psychological, economic, social, and physical harm and devastation that continues to this day. Although her recovery is beginning, it will never be complete. The power given to abusive young men like Coltri must be stopped. They cannot learn that lies, prejudice, and attacks on humanity and womanhood will be supported by the criminal justice system or our country.

It is inherent in a malicious prosecution claim that a false arrest or imprisonment has occurred, if only for the acquitted charge of aggravated battery.

Coltri's violation of Plaintiff's civil and human rights also includes perjury. Even the Appellate Court recognized Coltri's many inconsistencies in testimony, although it still protected him. Her Honor recognized Coltri's "cover up" of his use of "excessive force" when she alluded to its possibility in her decision.

Although there is still a question to be answered of when the actual seizure of Plaintiff occurred, and if it was illegal, there is no doubt the malicious prosecution and false imprisonment began at the point that Coltri arrested and imprisoned her on the false felony charge of aggravated battery.

### VII. Human Rights, Morality, and International Law

Plaintiff's believes Defendant violated her Human Rights. Human Rights allow the Court to be free from restrictive civil law and review cases under International Human Rights laws, which honor our moral obligations to victims and survivors of criminal offenses perpetuated by the State. Within her Honor's decision the Plaintiff believes there was a moral judgment to find that Defendant used excessive force which alienated Plaintiff's human rights per international law.

### VIII. First Amendment

Plaintiff wholeheartedly believes she was followed, blocked in the lot, and attacked because Bruno Coltri escalated and got angry with her for merely exercising her First amendment right. Specifically, he violated her right to complain and question his interpretation of law.

Plaintiff testifies that she got out of her car, and asked Coltri if he was writing a ticket. Eventually, after receiving no response from Coltri except for him to scream, "What!" she then asked him "Why are you being so disrespectful?" After asking him for a second time, he hollered, "That's it!" got out of his vehicle, stomp around his car and tried to put her in a choke hold." (Exhibit B, TT, pages 79, lines 13-24, pages 80-81 lines 1-24.)

Defendant's entire case revolves around words because the facts are clear, Coltri attacked Plaintiff because he did not like the way she spoke to him. Defendant's counsel continues to bombard this Court with Plaintiff's alleged speech; their rabidity is boundless. Defendant alleges sarcasm; he alleges cussing, hollering, he alleges everything possible within the stereotype of the angry Black/African woman.

The facts are clear, once Plaintiff asked Defendant about his behavior, which was at a minimum aberrant and volatile, he attacked her. He lost control, escalated to a point of fear for his own job, and he abused the power of his badge, all while his perjurous and outrageous statements that a woman would use her breast as weapons, gingerly flowed through a male dominated, racially stereotyping, and misogynistic court system. Only Judge Tucker stopped the flow of madness in the Illinois state's courts.

In Conclusion

Coltri should have been charged with aggravated battery at the state level, or at a minimum perjury. It is only because we do not have video, which Plaintiff argues is only because he did not turn on his lights so that the dashcam would automatically engage to capture the video that would have been used as evidence to convict him; that he was not prosecuted. Devoid of a state charge, we must argue criminal excessive force.

If this incident had occurred in 2015, Pamela would have videotaped it with her phone instead of taking a lone picture before her first amendment right was violated. Although, her own trauma and fear may have prevented her from doing so, this omission does not diminish her witness testimony. She, like the Plaintiff, has consistently testified that Coltri followed; blocked Plaintiff in the lot; and injured her. No one but Coltri testifies to a "chest bump" and no one but Coltri testifies to Plaintiff hollering, cussing, running, hitting, kicking, slapping and punching him with closed fists. Even Officer Newton only testifies to seeing a struggle, and he did not believe the incident required, and was not ordered by his Sargeant to write, a use of force or Supplemental Narrative report for the alleged taser threat. This threat narrative coincidentally, does not appear in the LaManna's report, the charges, or the preliminary hearing testimony by Coltri.

There is no video or pictures to support Coltri being punched in his face, or injured in anyway. Conversely, Plaintiff has pictures; documents; Coltri's contradicting statements; medical records; faulty and coincidentally missing police reports; EMT reports; and witness statements to support her version of the events. Plaintiff has the preponderance of the evidence. Even Coltri's own Sergeant admits that Coltri did not tell him that he told Plaintiff she was under arrest.

Does Heck apply when you can be convicted of a crime that does not require probable cause? Numerous cases have found that Heck is not applicable to charges that have secured acquittals, in this case Plaintiff's aggravated battery.

Will this Court decide that Plaintiff's submission to Coltri's authority occurred when he blocked her car in a parking lot for no legally articulated reasonable suspicion which constitutes an illegal seizure?

Is it more reasonable for a Plaintiff, especially one of African descent, to walk towards a friend's stop, after being told to move away from it, versus staying focused on the concerning behavior of an officer who had limited her choices of movement and deprived her of liberty?

In California v Hodari D., 499 U.S. 621 (1991) the US Supreme Court ruled;
*"To constitute a seizure of the person, just as to constitute an arrest - the quintessential "seizure of the person" under Fourth Amendment jurisprudence – there must be either the application of physical force, however slight, or, where that is absent, submission to an officer's show of authority to restrain the subject's liberty."*

Since the Illinois Appellate Court overstepped its bounds by rejecting the trier of fact determined by the District court, but still found that Plaintiff reserved her right to self defense, will the arguments presented be determined to prove excessive force on the aggravated battery acquittal?

Plaintiff's resisting conviction follows the black letter of the law, which states that she cannot resist an unlawful arrest. She states it is easy to convict under the black letter of this law, especially if you focus on speech. But Plaintiff is not challenging her conviction; she is making a facial challenge to Illinois State's resisting arrest statute. She alleges that the resisting statute, as written, is legislation that is always unconstitutional, and therefore is void.

Plaintiff is fully aware that some of these arguments, based on her representation by Schiller Preyar law were withdrawn. She did so want to make the arguments contained in this motion when she was well enough. But as stated by her previous representation, she will withdraw it in case of a failed argument. She also states for the record that there was no agreement to withdraw her claim under the First amendment, and she was surprised by its exclusion.

DATED: May 03, 2018

Respectfully submitted,
Plaintiff - Appellant Crista E. Noel

By _____
Pro Se by Crista E. Noel

219F. Dodge Avenue
Evanston, Illinois 60202

## IN THE UNITED STATES DISTRICT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CRISTA E. NOEL** | ) | |
| **Plaintiff-Appellant** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.    1:10-cv-08188** |
| **BRUNO COLTRI** | ) | **The Honorable Judge JAMES B. ZAGEL** |
| **Defendant - Appellee** | ) | |
| | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she is the attorney for Plaintiff and that she served a copy

of the foregoing on all counsel of record by causing the same to be delivered before the hour of

5:00 p.m. by USPS on May 08, 2017 to the following address:

    Thomas R. Weiler (Atty No. 06184955)
    John A. Masters    (Atty No. 6299434)
    LANGHENRY, GILLEN, LUNDQUIST & JOHNSON, LLC
    Attorneys for Defendants, the Village of Westchester and Officer Bruno Coltri
    33 North Dearborn Street – Suite 1650
    Chicago, IL 60602
    Tel: (312) 704-6700

                        By_____
                        Crista E. Noel
                        Pro Se
                        219F Dodge Avenue
                        Evanston, IL 60202-3668
                        January 16, 2018

| 09-0015 | Narrative / Supplemental | |  | 10300 W Roosevelt Rd |
|---|---|---|---|---|

**09-0015** | **Narrative / Supplemental**

Offense / Incident
**BATTERY TO POLICE OFFICER** | Page 2 Of 3

10300 W Roosevelt Rd
Westchester, IL 60154
(708)345-0060   FAX (708)345-0799

Location / Address of Occurrence
**BALMORAL AND CERMAK**

**In summary not verbatim nor in its entirety, the facts related are as follows:**

ON THIS DATE AND TIME, R/O SPOKE TO THE COMPLAINANT, (C) OFC. COLTRI, M/W, WHO ADVISED THAT HE HAD BEEN BATTERED ON THIS DATE AND TIME. (C) RELATED THAT ON THIS DATE, HE WAS ASSIGNED TO PATROL FOR THE WESTCHESTER POLICE DEPT. OFC. COLTRI WAS ASSIGNED A MARKED PATROL VEHICLE, UNIT 586 AND DRESSED IN FULL POLICE UNIFORM. (C) ADVISED THAT HE WAS NOTIFIED VIA THE WESTCHESTER 911 COMMAND CENTER TO BACK UP ANOTHER OFFICE OFC. NEWTON, WHO WAS CONDUCTING A TRAFFIC STOP IN THE ABOVE AREA. (C) ADVISED THAT HE PULLED UP TO OFC. NEWTON'S STOP AND WAS ADVISED THAT A SECOND VEHICLE HAD PULLED IN FRONT OF HIS TRAFFIC STOP AND WAS CONCERNED. (C) RELATED HE PULLED HIS PATROL VEHICLE NEXT TO THE VEHICLE THAT HAD PULLED IN FRONT OF OFC. NEWTON'S TRAFFI STOP, NOW IDENTIFIED AS IL REG T879315. (C) RELATED THAT HE ASKED THE DRIVER OF THE VEHICLE, (A), IF HE COULD HELP HER. (A) RESPONDED "CAN I HELP YOU!?" WITH A VERY SARCASTIC VOICE. (C) THEN ASKED (A) TO PULL HER CAR OVER TO THE NEXT SIDE STREET TO AVOID INTERFERENCE WITH TRAFFIC AND OFC. NEWTON'S STOP. (C) ADVISED R/O THAT (A) THEN STATED, "I DONT HAVE TO GO FUCKING NOWHERE, IM SICK OF YOU PEOPLE PICKING ON US. HE ONLY STOPPED HER BECAUSE SHE'S BLACK!" (C) ADVISES HE THEN TOLD (A) SHE WOULD RECIEV A PARKING TICKET IF THE VEHICLE DID NOT MOVE OFF OF THE STREET. AT THIS TIME, (C) RELATED (A) MOVED HER CAR INTO A PARKING LOT APPROX 40 FEET FROM THE TRAFFIC STOP.

AT THIS TIME, (C) ADVISED THAT (A) PULLED INTO THE FIRST PARKING SPACE IN THE LOT, WHILI HE PULLED HIS PATROL CAR ONTO THE STREET AT THE APRON OF THE DRIVEWAY. (C) RELATES THAT AT THIS TIME, HE WAS ENTERING THE VEHICLE'S REGISTRATION NUMBER INTO THE LEAD COMPUTER. WHILE (C) WAS WAITING TO RECEIVE THE VEHICLE INFORMATION, THE DRIVER OF THE CAR, (A), GOT OUT OF THE VEHICLE AND BEGAN SCREAMING, "ARE YOU WRITING ME A FUCKIN TICKET!?" YOU BETTER NOT WRITE ME A MUTHA FUCKIN TICKET!" WHILE POINTING AT . (C) RELATES (A) THEN CHARGED HIS PATROL CAR AT WHICH TIME HE ALSO EXITED HIS VEHICI FOR SAFETY REASONS. (C) THEN ASKED (A) TO STOP WHERE SHE WAS, NOW BRISKLY WALKING TOWARDS (C). (C) RELATED THAT HE OBSERVED (A) EXTENDING HER ARM OUT TO THE SIDE IN / PROVOKING MANNER AND THE OTHER HAND WHICH WAS HOLDING AN OBJECT (LATER IDENTIFIED AS A CELL PHONE) MOVING FORWARD, TOWARD (C). (A) THEN GOT CLOSE ENOUGH CHEST BUMP (C). (C) ADVISED THAT AT THIS TIME, HE TRIED TO TAKE (A) INTO CUSTODY AT WHICH TIME SHE RESISTED HIM. (C) ADVISED THAT (A) BEGAN TO TWIST AWAY, PUNCH, KICK, AND KNEE HIM. (C) ADVISED HE WAS STRUCK WITH OPEN AND CLOSED FISTS IN THE FACE AND HEAD AREA AS WELL AS KICKED IN THE SHIN AND ANKLE AREAS. (C) ADVISED THAT HE WAS ABLE TO CUFF ONE OF (A)'S HANDS, BUT WAS AGAIN RESISTED BY (A) WHEN ASKED TO RELINQUISH THE SECOND HAND. (C) AND OTHER WPD OFFICERS WERE FINNALY ABLE TO SUBD (A).

Reporting Officer _____ Star # 127    Supervisor _____ 07

1    A.    Well, he screamed at me, and I asked him why

2    he was being so disrespectful.

3    Q.    Then what did he do?

4    A.    Well, he didn't answer me.

5    Q.    And was he in his car at this time?

6    A.    Yes, he was still in his car.

7    Q.    After not answering you, what did you do, if

8    anything, and what did Officer Coltri do?

9    A.    I asked him again why he was being so

10   disrespectful, and he then said:  That's it.  And he

11   jumped out of his car and he started to stomp around

12   his car to the back, and he came alongside me and

13   came up to me, and I was still trying to process what

14   "that's it" meant, and he came around to the end of

15   the car, and I saw him --

16   Q.    When he came next to you, what if anything

17   did you see Officer Coltri do?

18   A.    He reached out his hand like this, and I saw

19   his hand come at me.  I was standing this way, and he

20   was coming at me like this (indicating).

21   Q.    From your left, correct?

22   A.    Yes, from my left.  I still had my cell

23   phone in my hand.  And when he came towards me, I saw

24   his fist come around, and at that point he came over

N-80

LOYOLA
UNIVERSITY
CHICAGO

## LOYOLA EMS SYSTEM AMBULANCE REPORT

WESTCHESTER
FIRE DEPT.

DEPT.

License # **80830!** Unit # **301** [ALS] ILS BLS Ser. # **454806**

Incident # **09-5-5** Date __/__/__ Hospital Log/Tape __/__

Services Rendered:
ALS   ILS   BLS

**PATIENT INFORMATION:**

NAME (Last) **Noel** (First) **Crista** (MI)

HOME ADDRESS **219 Dodge** APT. # **F**

CITY **Evanston** STATE **IL** ZIP **60202**

AGE **48** D.O.B. **5,11,60** SEX M (F) WEIGHT PHONE **(847) 570-0194**

CHIEF COMPLAINT **Prisoner in Pain**

INITIAL IMPRESSION **Pt c/o shoulder Pain**

EXPOSURE GLOVES Y N SYSTEM # | | | | |

MASK Y N SYSTEM # | | | | |

BLOOD / BODY FLUID / NEEDLE STICK FORM COMPLETED Y N

LOCATION **WPD**

TREATMENT PRIOR TO ARRIVAL:
☑ None
☐ Extrication
☐ CPR
☐ First Aid
☐ Other

NATURE OF CALL
☐ Cardiac
☐ Medical
☐ OB/GYN
☐ Psych.
☐ O.D.
☐ Vehicle Acc.
☑ Other Trauma
☐ Other

**PHYSICAL CONDITION:**

GCS **15** Trauma Score **12** Peds Trauma Score ___ Trauma Data Y ☒N

**STATUS**
☑ Alert
☐ Responsive to Verbal
☐ Responsive to Pain
☐ Unresponsive
☐ Cooperative
☐ Uncooperative

**PUPILS**
L ☑ R ☑ P.E.R.R.L.
☐ ☐ Constricted
☐ ☐ Midrange
☐ ☐ Dilated
☐ ☐ Responsive
☐ ☐ Unresponsive
☐ ☐ Sluggish

**LUNG SOUNDS**
L R
☑ ☑ Clear
☐ ☐ Absent
☐ ☐ Rhonchi
☐ ☐ Wheeze
☐ ☐ Rales
☐ ☐ Post Intub.

**SKIN COLOR**
☑ Normal
☐ Pale
☐ Flush
☐ Cyanotic

**SKIN TEMP**
☑ Normal
☐ Hot
☐ Warm
☐ Cool
☐ Cold

**SKIN MOISTURE**
☑ Normal
☐ Dry
☐ Moist
☐ Diaphoretic

**CAPILLARY REFILL**
☐ Normal
☐ Delayed

ALLERGIES:
**NKA**

MEDS: ☒ None

**HISTORY**
☑ None
☐ Hypertension
☐ Diabetic
☐ COPD

☐ Cardiac
☐ CA ___
☐ Other ___

**HISTORY OBTAINED FROM**
☑ Patient/Family
☐ Unavailable
☐ Other ___ **99%**

M.D.

Hospital

| VITAL SIGNS | | | | CARDIAC | | | DRUGS | | |
|---|---|---|---|---|---|---|---|---|---|
| TIME | B/P | PULSE | RESP | TIME | RHYTHM — DEFIB/W.S. | TIME | DRUG/SOLUTION | DOSE | ROUTE |
| 1517 | 124/86 | 110 | 20 | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**AID GIVEN PATIENT:**

| | Oxygen —L / C M N V | | C.P.R. | | Vehicular Extrication | | External Jugular |
| | Ventilation | | Cardiac Monitor | | Full Spinal Immobilization | | Pleural Decompression |
| | E.T. | | Defib./Cardiovert. | | KED/Short Board | | O.B. Delivery |
| | Post E.T. lung sounds | | I.V. Size ___ Site ___ | | Bandaging/Bleeding Control | ✓✓ | Vital Signs |
| | E.T. unsuccessful | | I.V. Unsuccessful | | Splint ___ (type) | NCC | Assessment |
| | Cricothyroidotomy | | Chemstrip | | Anti-Shock Trousers | | Communications |
| | Suction | | Drugs | | Cold Application | | Other |

**COMMENTS:** Called to scene for pt w/ headache. UOA found pt in PD custody. Pt states she was attacked by PD. PD states pt was resisting arrest + had to be forcefully arrested. Pt c/o L shoulder pn + abrasion to L temple w/ minor abrasion to R wrist + R ankle. Pt Ø swelling or deformity w/ good motor + sensory. Pt's wounds cleaned + icepack given for shoulder. Pt signed + understood refusal policy ISDR n~ 177

**COMMUNICATIONS:**

Medical Direction From: ___
☐ Telemetry ☐ Merci ☐ Telephone
M.D. ___
R.N. ___
Closest Hosp. ___ ETA ___
Desired Hosp. ___ ETA ___
Receiving Hospital ___
Diversion Y N

**TIME INFORMATION:**

| 1|5|1|0 | Call Received |
| 1|5|1|2 | Crew Enroute |
| 1|5|1|3 | Arrive Scene |
| 1|5|3|0 | Depart Scene |
| | Arrive Hospital |
| | Depart Hospital |
| 1|5|3|0 | Back-in-Service |

**ASSISTANCE:** Ø

☐ FIRE ☐ OTHER UNIT
☐ POLICE ☐ BYSTANDER

**CREW SIGNATURES:**

1. ___ **177**
Form Completed By ___ System #

2. ___
Name ___

3. **N Croucher** **312**
Name ___ System #

☐ CONTINUED

ROAD CONDITIONS:
☐ Dry ☐ Wet
☐ Ice ☐ Snow

TRAFFIC:
☐ Heavy
☑ Light
☐ Normal

| .: # 09-0015 | Narrative / Supplemental | | 10300 W Roosevelt Rd<br>Westchester, IL 60154<br>(708)345-0060  FAX (708)345-0799 |
|---|---|---|---|
| Offense / Incident<br>BATTERY TO POLICE OFFICER | Page 3 Of 3 | | |
| Location / Address of Occurrence<br>BALMORAL AND CERMAK | | | |

**In summary not verbatim nor in its entirety, the facts related are as follows:**

R/O READ (A) HER MIRANDA WARNINGS AT 1610 HOURS. (A) SIGNED OFF ON THE FORM INDICATING SHE UNDERSTOOD HER RIGHTS. (A) STATED TO R/O "IM SICK OF THE POLICE PICKING ON US". R/O SPOKE TO A.S.A HODAL AT 1632 HOURS AND WAS ADVISED TO USE FELONY APPROVAL NUMBER 094JH010104. (A) WAS CHARGED WITH AGG. BATTERY TO POLICE OFFICER AND RESISTING ARREST. (A) WAS PHOTOGRAPHED, FINGER PRINTED AND PROCESSED UNDER WPD NUMBER 16992. (A) WAS PLACED IN CELL #1 TO AWAIT THE 010209 BOND HEARING. (A)'S VEHICLE WAS TOWED BY POWERS TOWING AND HER PROPERTY WAS TOT FRIEND PAMELA TOLBERT PER (A)'S REQUEST.

| Reporting Officer | Star # | Supervisor |
|---|---|---|
| _[signature]_ 137 | | _[signature]_ 137 |

1     Q.   And she came up to your car, and you got out

2   of your vehicle, correct, walked behind your car up

3   to Miss Noel, behind the trunk of your car?

4     A.   I got out of my vehicle as she was walking

5   up to my car, and I got out of my car, went behind my

6   car before she was there.

7     Q.   And Miss Noel left her car door open and her

8   engine running, isn't that correct?

9     A.   I would not be able to see that side her car

10   from where I was.

11     Q.   But later on you learned that her engine was

12   running and the door was open?

13   MS. BERG:  Objection.

14   THE COURT:  Overruled.

15   THE WITNESS:  I learned that her car was running.

16   I do not recall the status of the door.

17   BY MR. ROSENBLAT:

18     Q.   Now, it is your testimony today that Miss

19   Noel chest bumped you, is that correct?

20     A.   Yes, sir.

21     Q.   It is your testimony that this 50-year-old

22   woman used her chest as a weapon and thrust her chest

23   out at you to strike you with her chest?

24     A.   Yes, sir.

```
 1        A.   I observed the defendant move the car into

 2     an open parking lot there off of Belleview Street.

 3     She pulled about 30 feet into the lot and pulled into

 4     a parking spot.

 5        Q.   And what did you do with your vehicle?

 6        A.   I pulled my vehicle parallel, like I was

 7     parking at a curb on a street, which there was an

 8     apron there to go into the driveway of that parking

 9     lot.  I pulled my vehicle up there, and I was

10     attempting to enter her vehicle's plate number into

11     my in-car computer.

12        Q.   And why were you running her plate at that

13     time?

14        A.   I wanted to know who the car belonged to and

15     who I was talking with.

16        Q.   And while you were in the car, what

17     happened?

18        A.   I heard some screaming, and I looked over,

19     and the defendant was out of her car, coming at me.

20     I rolled down the passenger window, and I could hear

21     her yelling some things at me.

22        Q.   What was she yelling?

23        A.   I heard the defendant yell:  Are you writing

24     me a parking ticket?  You better not be writing me a
```

1     A.   Yes, sir.

2     Q.   Do you recognize it?

3     A.   Yes, sir.

4     Q.   Does that truly and accurately depict the

5   way your car was parked on January 1, 2009, when you

6   were arresting Miss Noel?

7     A.   Yes, sir, it is.

8   MR. ROSENBLAT:  Offer this into evidence.

9   BY MR. ROSENBLAT:

10     Q.   So you are blocking the exit to the parking

11   lot for Miss Noel to go back out into the street, is

12   that correct?

13     A.   If Miss Noel was trying to get out, my squad

14   car would be blocking hers.

15     Q.   And then she got out of her car and

16   approached your car, is that correct?

17     A.   Yes, sir.

18     Q.   And she was walking towards your car?

19     A.   She was walking -- it would be faster than a

20   walk.  It would be like a rather quick walk, less

21   than a run.

22     Q.   This is January 1 though, it is cold

23   outside?

24     A.   Yes, it was cold outside that day, sir.

1    Q.    Then what happened?  What did Officer Coltri

2    do?

3    A.    He started to follow me, and I said:  Pam,

4    oh, my God, he is following me.

5    Q.    And then what happened?

6    A.    I pulled into the mall, and realized --

7    well, when I was going south I realized that Pam was

8    facing east, and I was getting ready to drive into a

9    neighborhood, I didn't know where I was, so I said

10   okay, pull into this parking lot, and I was going to

11   three point and come back out when I saw that Officer

12   Coltri had blocked the entrance to the parking lot.

13   Q.    So you were going to pull back out so you

14   were facing back onto Cermak?

15   A.    Instead of he told me to pull my car and

16   park on the side street, so I was going to pull out

17   and park on the side street so when Pam headed east I

18   could make a right and turn behind her.

19   Q.    And after -- so you are in the parking lot,

20   Officer Coltri blocks you in the parking lot.  What

21   happens next?

22   A.    I say to Pam:  Oh, he is blocking me.

23   Q.    And what did you do?

24   A.    I told her that I was going to get out of



N-76

1    directly to your right?

2         A.    To my right was a parking lot.

3         Q.    So Crista pulled into the parking lot, and

4    did you see what Officer Coltri did with his

5    automobile?

6         A.    Officer Coltri followed Cris in the

7    direction of the lot, and he pulled his car into the

8    entranceway of that parking lot where Cris was.

9         Q.    And would his car have been blocking --

10   MS. BERG:  Objection.

11   THE COURT:  Overruled.  I have got to hear the

12   whole question.

13   BY MR. ROSENBLAT:

14        Q.    If you know, would his car have been

15   blocking the exit to the parking lot?

16   MS. BERG:  Objection.

17   THE COURT:  Overruled.  She can answer that.

18   THE WITNESS:  Yes, his car was.

19   BY MR. ROSENBLAT:

20        Q.    And so you see Crista's car in the parking

21   lot.  Are there any other cars in the parking lot?

22        A.    There could have been maybe one or two cars

23   parked.  There wasn't very many cars in the lot.

24        Q.    So Crista's car is in the parking lot,

N-43

1      Q.    Now, you stated that you were there

2  backing up Officer Newton, is that correct?

3      A.    Yes, sir, I was.

4      Q.    And this was a traffic stop of an

5  unrelated matter that Officer Newton was handling,

6  is that correct?

7      A.    His traffic stop was an unrelated matter

8  to mine.

9      Q.    And when you pulled up, you initially

10  spoke with Officer Newton, is that correct?

11      A.    Yes, sir, I did.

12      Q.    Now, when you pulled up to that location,

13  the vehicles were lined up.

14          It was Officer Newton's vehicle first, is

15  that correct?

16      A.    That's correct.

17      Q.    And then the vehicle had stopped, is that

18  correct?

19      A.    That's correct.

20      Q.    And then there was the third vehicle in

21  line was defendant's vehicle, is that correct?

22      A.    Yes, sir.

23      Q.    Now, those vehicles were all parked off

24  to the side, is that correct?

1   was relaxed, I had been off since December 22, I was

2   feeling good, I had no reason to run over to him, and

3   I walked over to him, and I asked him again, I was

4   like:  Are you writing me a parking ticket?

5       Q.   Where are you in relation to Officer

6   Coltri's car?

7       A.   At this point, his car is probably where

8   that desk is, and I am standing about right here, and

9   I had my cell phone in my hand like this

10  (indicating).

11      MR. ROSENBLAT:  About five, six yards.

12  BY MR. ROSENBLAT:

13      Q.   What happened next?

14      A.   He looked up and he screamed:  What?

15      Q.   And then what happened?

16      A.   I looked at him --

17      MS. BERG:  I am objecting to the witness

18  continuing to talk for other people.  She can only

19  testify to what she said.

20      THE COURT:  You are correct.  That's right.

21  BY MR. ROSENBLAT:

22      Q.   Miss Noel, Officer Coltri said something to

23  you, and then what happens after he says something to

24  you?  What does he do?

1    A.    Well, he screamed at me, and I asked him why

2    he was being so disrespectful.

3    Q.    Then what did he do?

4    A.    Well, he didn't answer me.

5    Q.    And was he in his car at this time?

6    A.    Yes, he was still in his car.

7    Q.    After not answering you, what did you do, if

8    anything, and what did Officer Coltri do?

9    A.    I asked him again why he was being so

10   disrespectful, and he then said:  That's it.  And he

11   jumped out of his car and he started to stomp around

12   his car to the back, and he came alongside me and

13   came up to me, and I was still trying to process what

14   "that's it" meant, and he came around to the end of

15   the car, and I saw him --

16   Q.    When he came next to you, what if anything

17   did you see Officer Coltri do?

18   A.    He reached out his hand like this, and I saw

19   his hand come at me.  I was standing this way, and he

20   was coming at me like this (indicating).

21   Q.    From your left, correct?

22   A.    Yes, from my left.  I still had my cell

23   phone in my hand.  And when he came towards me, I saw

24   his fist come around, and at that point he came over

1    to me, and I guess he slammed into me because I had a

2    bruise on my leg here, and I am guessing his baton or

3    something.

4        MS. BERG:  Objection to what she guesses.

5        THE COURT:  Sustained.

6    BY MR. ROSENBLAT:

7        Q.   What else happened?

8        A.   The next thing I know -- let me take my

9    glasses off.  He had his arm around my face like

10   this, and I said:  Oh, my God, you know.  And he

11   smashed my glasses to my face, and these are the

12   glasses, and they are still kind of smashed.  He

13   smashed my glasses to my face.  I said:  Oh, my God,

14   he is trying to put me in a choke hold.

15       Q.   And then what happened?

16       A.   I ducked, and I had a baseball hat and

17   earmuffs, and all of it went flying off.  I ducked

18   down.

19       Q.   And then what happened after you ducked

20   down?

21            (Brief pause.)

22   BY MR. ROSENBLAT:

23       Q.   You can take your time.

24       THE COURT:  You can take a break if you want.  She

N-81

1    A.    She said with a very sarcastic voice, can

2    I help you.

3    Q.    Okay.

4          And what did you -- what did you do at

5    this point?

6    A.    I advised her that she couldn't park

7    in -- on that street at Cermak because there was no

8    parking there.

9    Q.    Did you tell her to move her vehicle?

10   A.    Yes, sir, I did.

11   Q.    And how did she respond?

12   A.    She was very upset.

13   Q.    Did she tell you whether or not she was

14   going to move her vehicle?

15   A.    She said she did not have to move her

16   vehicle and I believe there was an expletive in

17   there.

18   Q.    So she refused to move her vehicle at

19   this time?

20   A.    Yes, sir.

21   Q.    What happened next?

22   A.    I advised the driver of the vehicle that

23   if she didn't move her car, that I would have to

24   write her a parking ticket.

A-6

1    pull to the side?

2         A.    It pulled to the side around the corner.

3         Q.    And when it was around the corner, could you

4    see Officer Coltri's car?

5         A.    No, I could not.

6         Q.    Could you see the vehicle that was

7    previously parked in front of yours?

8         A.    No, I could not.

9         Q.    And tell the Judge why not?

10        A.    There is a brick building between -- it juts

11   out, and I couldn't see through the building.

12        Q.    And while on scene there at any point did

13   Officer Coltri ask for your help?

14        A.    Yes, he did.

15        Q.    And did you then go around the building?

16        A.    Yes, I did.

17        MR. ROSENBLAT:  Objection.  Leading.

18        THE COURT:  Sustained.

19   BY MS. BERG:

20        Q.    Tell the Judge what you saw when you were

21   around the building?

22        A.    When I pulled around the building, I saw

23   Officer Coltri and the defendant, there she is,

24   struggling in front of his vehicle.

31

1    Q.  I know it is kind of small.  What's the time

2  and date of that picture?

3    A.  2:28.  Actually, it is 1428, but in English

4  it would be 2:28.

5    Q.  Now, you said you generally couldn't see

6  what took place because there is a building blocking

7  your way?

8    A.  Yes.

9    Q.  How far down west of Cermak were you

10  initially stopped with Pam Tolbert from the parking

11  lot?

12    A.  Half a block.  Half a short block.

13    Q.  So you did not ever observe obviously Miss

14  Noel chest bump Officer Coltri?

15    A.  No, I did not.

16    Q.  And you were obviously more concerned with

17  your traffic stop than you were withy what was going

18  on between Miss Noel and Officer Coltri, is that

19  correct?

20    A.  Yes.

21    Q.  And you did not write any reports concerning

22  this offense, did you?

23    A.  No.

24  MR. ROSENBLAT:  Thank you.  I have no further

34