1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4   CRISTA E. NOEL,                    )   No. 10 C 8188
                                       )
5                    Plaintiff,        )
                                       )
6              vs.                     )   Chicago, Illinois
                                       )
7   BRUNO COLTRI,                      )
                                       )   May 29, 2019
8                    Defendant.        )   2:00 p.m.

9                  TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HON. SARA L. ELLIS

11
    APPEARANCES:
12
    For the Plaintiff:   MS. ELIZABETH A. EKL
13                       MR. DANIEL BURNS
                         Reiter Burns LLP
14                       311 South Wacker Drive, Suite 5200,
                         Chicago, Illinois  60606
15
    For the Defendant:   MR. THOMAS R. WEILER
16                       MR. JOHN A. MASTERS
                         Langhenry, Gillen, Lundquist & Johnson, LLC
17                       33 North Dearborn Street, Suite 1600,
                         Chicago, Illinois  60602
18

19

20

21

22

23                   PATRICK J. MULLEN
                  Official Court Reporter
24             United States District Court
           219 South Dearborn Street, Room 1412
25              Chicago, Illinois  60604
                    (312) 435-5565

1      (Proceedings in chambers on the record.)

2          THE COURT:  So this is a final pretrial conference for

3   10 C 8188, Noel versus Coltri.  Why don't we put everybody's

4   name on the record.

02:12:14    5          MS. EKL:  Elizabeth Ekl for the plaintiff.

6          MR. BURNS:  Daniel Burns for the plaintiff.

7          MR. WEILER:  Thomas Weiler for defendant.

8          MR. MASTERS:  John Masters for defendant.

9          THE COURT:  All right.

02:12:25   10          MS. EKL:  And Krista Noel, the plaintiff, is also

11   present.

12          THE COURT:  Great.  So we can go through the pretrial

13   order.  Before we kind of get started into all of that, I

14   always start my final pretrial conferences by confirming that

02:12:43   15   everybody is ready and on board to go to trial and that there

16   is no desire to turn this into a settlement conference.

17          MR. WEILER:  I think we're kind of past that point, at

18   least from the way it seemed, but never say never.

19          (Discussion off the record.)

02:13:31   20          THE COURT:  All right.  Why don't we go through the

21   motions in limine first just so that everybody is on the same

22   page before we start.  All right.  So Ms. Noel, starting with

23   her motions in limine, 1A is to bar the opinions by Dr. Rone

24   about her prior mental health.  I am denying that motion in

02:21:25   25   limine.  I do find that it would be relevant to assisting the

jury in terms of any injuries that Ms. Noel claims.  Obviously
if it's, you know, going to go beyond that, then you can object
at trial, and I'll rule on that objection.

02:22:00

The second one is to bar opinions by Dr. Rone about
Ms. Noel's credibility, and I'm denying that as well.  Dr. Rone
can't testify as to whether she believes that Ms. Noel would be
a credible witness, but she can testify as to her examination
of Ms. Noel, any records that she reviewed, and the basis for
any opinions that she's giving.  So, you know, for example, she

02:22:50

could say:  When I was examining Ms. Noel and asking her
questions, I didn't find that her answers were consistent, and
that's the basis of my opinion.

She cannot testify, though:  I don't find Ms. Noel to
be or that she would be a credible witness.

02:23:14

So she can't give opinions that the jury would then
take in terms of Ms. Noel's credibility.

MS. EKL:  May I ask a question about that?

THE COURT:  Sure.

MS. EKL:  She rendered some opinions where she

02:23:27

basically testified that she believed the prior doctor's
opinions were based on Ms. Noel's, I guess, untruthful or
incomplete answers.  So she's giving credibility judgments to
what Ms. Noel told the doctor that had previously examined her
as well.  Will she be allowed to testify to that?

02:23:51

THE COURT:  Well, she can say -- so she can testify to

1     the basis of her opinion.  She can say:  This is my opinion,

2     and this is what I based it on.

3          So she can say:  I came to this opinion because I

4     found that Ms. Noel didn't tell this other doctor the full --

02:24:17   5     all the information about what happened or Ms. Noel

6     misrepresented what happened.  So that's why I don't think that

7     this other opinion is valid.

8          MS. EKL:  I guess the only other question I had

9     regarding that, she also says that the doctor's opinions were

02:24:46   10    based solely on Ms. Noel's self-reporting, and I think that

11    that's just an assumption that she's making.  Would she be

12    allowed to testify to that as well?

13         THE COURT:  Well, I mean, you can cross her on that,

14    right?

02:24:59   15         MS. EKL:  Right.  Okay.

16         THE COURT:  So you can say there's nothing there.  You

17    know, you can ask her what the basis of that opinion is, and

18    you can cross her on that.  So she can say:  This is what I'm

19    basing my opinion on, that I didn't see anything else in the

02:25:17   20    record in these records to support this doctor's opinion other

21    than what Ms. Noel told her.

22         Then, you know, you can cross her on that and say,

23    well, you know, actually there's all these other things.

24         MS. EKL:  Okay.

02:25:38   25         THE COURT:  Whatever that is, that can be an area for

1    cross.

2            MR. WEILER:  I think it clearly was Dr. Rone's

3    testimony that she didn't have anything to base her opinions on

4    other than what Crista Noel told her.  That was how she does

02:25:53    5    her therapy.

6            MR. MASTERS:  Robinson.

7            MR. WEILER:  Dr. Robinson.  I'm sorry.  Dr. Robinson.

8            THE COURT:  All right.  Then the second one is to bar

9    testimony regarding prior psychiatric treatment.  I'm denying

02:26:12    10    that as well because I do find that it would be relevant in

11    determining the extent of Ms. Noel's injuries that she's

12    claiming.  Again, you know, that would be the only use for

13    this, so there shouldn't -- it should be somewhat limited.

14            The third one is to bar reference to Officer Coltri's

02:26:50    15    accommodations, awards, or education background.  I'm granting

16    that motion in limine in terms of accommodations and awards.

17    Certainly he can talk about his educational background in terms

18    of where he went to school and the training that he has because

19    that's relevant, but he is not to testify about any

02:27:23    20    accommodations or awards or anything of that nature.

21            Then depending on the cross, you know, if we need to

22    get into areas where he's allowed to rehabilitate himself, then

23    we can address that if it comes to it.

24            MS. EKL:  The only thing I would point out, Your

02:27:46    25    Honor, is that Ms. Noel, when she was representing herself, did

1    issue requests for the defendant's training records and his

2    personnel files, and she was denied the ability to get any of

3    those things.  So we have no way of impeaching him if he does

4    get up and try to say:  Well, now I'm going to talk about my

02:28:08    5    training or I'm going to talk about the fact that I, you know,

6    received awards.

7        Even if that's something that's later allowed in, we

8    have no ability to cross-examine him because we never received

9    those documents.

02:28:21    10    THE COURT:  Well, the only way that it would come in

11    is if you were to impeach him on his reputation for

12    truthfulness, right?  If he got some accommodation or award

13    for, you know, rescuing a cat out of a tree, that's not

14    necessarily relevant.  I mean, it would have to be relevant to

02:28:46    15    his character for truthfulness.  Depending on what the award

16    is, it's highly unlikely that it would be relevant.

17        So if you intend to rehabilitate him with anything

18    like that, you'd have to provide it to plaintiff's counsel

19    beforehand.

02:29:06    20    MR. WEILER:  Yeah.  At this point in time, we don't

21    intend to introduce that, you know, but if that changes at

22    trial we'll produce what we need to.

23        THE COURT:  Okay.  Number 4 is to bar reference to the

24    Ms. Noel's appeal of the criminal charges for resisting arrest.

02:29:37    25    So this really comes down to any argument regarding excessive

1    force.  So if the state courts have found already that

2    Mr. Coltri did not use excessive force during this arrest,

3    Ms. Noel is barred from any argument at all that he did.  At

4    that point, then it's really not relevant that she appealed her

02:30:05    5    conviction for resisting arrest.  That conviction at this point

6    stands, and I don't see the relevance of it for the purposes of

7    malicious prosecution on the battery charge.

8              MR. WEILER:  I think that was the basis.  The only way

9    we felt it would be relevant was if she was allowed to get into

02:30:38   10    this claim that Officer Coltri used excessive force, which we

11    believe was not relevant based on your rulings and the state

12    court's rulings.  But the way this case has gone, it's been the

13    central issue of this case, not only with Noel, but also with

14    her expert doctor, Dr. Robinson.  You know, it's replete with:

02:31:01   15    He attacked me.  He beat me.  He abused me.

16              So if that is out and if she's barred from making any

17    argument along those lines, then I don't think we need to get

18    into that.  But if there were to be any argument that Officer

19    Coltri used excessive force, then I think we definitely want

02:31:31   20    the Court to allow us to show what the Appellate Court ruling

21    was and that he was found not guilty of using excessive force

22    or not liable for using excessive force.

23              MS. EKL:  If I could, Your Honor?

24              THE COURT:  Yes.

02:31:51   25              MS. EKL:  The Appellate Court did not find

1    specifically that he was found not guilty of excessive force.

2         MR. WEILER:  No, I misspoke.

3         MS. EKL:  We still have a malice element that we have

4    to prove, and plaintiff intends to show -- well, she's not

02:32:04   5    going to argue that Coltri used excessive force or that she's

6    suffering from injuries as a result of any excessive force.

7    She does intend to show that as a result of what happened with

8    Officer Coltri, she received injuries, and we have photographs

9    that show injuries.  Whether they're excessive or not, they're

02:32:23  10    injuries, and they provided a motive for Officer Coltri to

11    charge her with aggravated battery.

12         THE COURT:  And that's where you're cabined in, right?

13    So you're allowed to do that.  You're not allowed to make any

14    argument to the jury that these injuries were the result of

02:32:42  15    excessive force or that these physical injuries are in any way

16    compensable because they're not.

17         MS. EKL:  I understand that.  We understand that.

18         THE COURT:  So the only way that the injuries come in

19    at all is as potential motive for malice, and that's it.

02:33:08  20         MS. EKL:  We understand.

21         THE COURT:  So there can't be any argument that -- and

22    it's a fine line to walk.  It's really a fine line to walk.

23    You really cannot argue and I will stop you if you argue that

24    Ms. Noel is allowed to recover for any of those damages.  So

02:33:33  25    her doctors can't talk about that.  You know, the psychologist

1    can't talk about that.  It can't come in.

2         When Ms. Noel testifies herself, she will be limited

3    to saying, you know:  This is what happened.  I had an abrasion

4    on my hand, you know, and something on my forehead, whatever it

02:34:06    5    was.

6         So that is it, but you can't argue that somehow she

7    can recover for those.

8         MS. EKL:  I understand.

9         THE COURT:  Okay.

02:34:14   10         MS. EKL:  My client understands as well.

11         THE COURT:  All right.  In turning to Mr. Coltri's

12   motions in limine, the first one is to bar opinion testimony

13   from undisclosed experts.  So the only expert as I understand

14   it at this point is Dr. Robinson, is that right?

02:34:37   15         MS. EKL:  The only expert that's not in addition to

16   who they've also listed on their list.

17         MR. WEILER:  Right.  We have Dr. Rone.

18         THE COURT:  Right.

19         MR. WEILER:  We had disclosed Dr. Rone --

02:34:47   20         THE COURT:  Right, as your rebuttal.

21         MR. WEILER:  -- in the event that Dr. Robinson was

22   going to be allowed to testify.  We didn't believe that she

23   should be able to testify.  I think in one of your first

24   statements from the bench when you took over the case, we were

02:35:09   25   talking about expert witnesses, and we said that plaintiff had

1    not disclosed any.  Then Ms. Noel said that she wanted to use

2    Dr. Rone, and we said she hadn't or there had been no

3    26(a)(2)(c), I think, disclosures.  Then Your Honor said if she

4    wasn't -- if the experts weren't properly disclosed, they're

02:35:36   5    not going to testify.  So that wasn't the -- that's true.  We

6    had deposed Dr. Robinson, but there had been no disclosure as

7    an expert under the rules, and we are moving to bar her on that

8    basis.

9         In addition, given your ruling on the injuries that

02:36:05   10   Ms. Noel can testify to, Dr. Robinson's opinions are

11   essentially that based on Ms. Noel's report to her that she was

12   attacked by Officer Coltri and beaten without provocation, she

13   suffered this trauma and she had the result -- you know, she's

14   gone to her for treatment, for therapy.

02:36:41   15        If that is not recoverable and we agree that it's not

16   recoverable, then I don't know really what Dr. Robinson is

17   going to be able to testify to that's relevant to the issue of

18   malicious prosecution, because she's not testified that she

19   suffered any psychological injury because of the fact that she

02:37:05   20   was charged with malicious prosecution.  It's that she was

21   beaten and unjustly treated by Officer Coltri.

22        THE COURT:  So again, you know, I haven't gone through

23   everything, you know, her whole deposition, but I'm going to

24   allow her to testify because I think in the end just in terms

02:37:34   25   of fairness, I don't believe that the defendants have been

1    prejudiced in that you've deposed her, you've gotten your own

2    rebuttal expert, so the whole point of the disclosure really

3    has been met.

4            But again, you know, she can't testify as to any

02:38:04    5    injuries, any psychological injuries that Ms. Noel might have

6    that arise from any allegations of excessive force.

7            MS. EKL:  And is that, I'm assume, limited to

8    psychological injuries that arise solely from excessive force?

9    But to the extent that the same injury is exacerbated and she

02:38:27    10    continues to have emotional and psychological issues as a

11    result of the criminal process, those are things that she would

12    be allowed to testify, is that correct?

13            THE COURT:  Yes, in part.  So she can't recover from

14    the prosecution for resisting arrest because she was convicted

02:38:50    15    and that conviction has been upheld on appeal.  So she cannot

16    recover from that.  So, I mean, Dr. Robinson is going to have

17    to parse this out and determine which psychological damages, if

18    any, come solely from the prosecution for aggravated battery,

19    and that's all that she can testify to.  Okay.

02:39:24    20            MS. EKL:  Understood.

21            THE COURT:  So she can't testify as to any injuries

22    from the encounter itself, and she can't testify as to any

23    injuries from the prosecution generally because it's tied in

24    with the resisting arrest trial.  I mean, they were tried

02:39:54    25    together.

1    MS. EKL:  If I could just proffer, I anticipate that

2  she's going to say that her injuries are based on the fact that

3  this was a felony offense that she was charged with in relation

4  to the aggravated battery and that that's what caused this

02:40:08    5  distress.  It wasn't the minor misdemeanor charge.  It was the

6  fact that she was being held on and prosecuted for a felony

7  offense.  So would she be allowed to testify to that?

8    THE COURT:  Sure, she can testify to that.  But, you

9  know, it has to be limited to the prosecution for aggravated

02:40:27   10  battery.

11    MR. WEILER:  And I understand Your Honor's ruling, but

12  that gets to the point where we're kind of put in a trick box

13  because there wasn't this disclosure of opinions.  So while I

14  deposed her as a treater and she talked, you know, 90 percent

02:40:47   15  about what the physical or what the trauma from the physical

16  attack as she kept referring to it was, there was minimal

17  reference to being charged with a felony.  That she felt

18  stigmatized, I think, was the extent of it.

19    THE COURT:  So what I would ask is that you go back to

02:41:17   20  Dr. Robinson and ask her, now that this is the limitation of

21  her testimony, what her opinions are based on her treatment of

22  Ms. Noel, then provide that to defense counsel.

23    MS. EKL:  If I could, Your Honor, based on your

24  ruling, it also raises some additional issues in relation to

02:41:46   25  Dr. Rone.  So Dr. Rone was asked to look at -- because again

1  all her opinions were made prior to the ruling by the Court, so

2  she was asked to look at whether or not the plaintiff suffered

3  damages as a result of the arrest.  So the way it's phrased in

4  their report right now, if we were looking at it from the

02:42:05  5  report side, those opinions wouldn't come in either because

6  they relate to the arrest.  Her opinions about some of the

7  other doctor's findings are also specific to the aspects

8  related to the arrest.

9          So could we ask that the defense provide us with a

02:42:18  10  more limited, I guess, report or let us know the more limited

11  opinions they expect Dr. Rone to elicit -- or they expect to

12  elicit from her?

13          MR. WEILER:  Well, we disclosed Dr. Rone only because

14  we were unsure what the status of Dr. Robinson would be.

02:42:45  15          THE COURT:  Yes, as a rebuttal.

16          MR. WEILER:  Our position from the beginning has been

17  if Dr. Robinson doesn't testify, then there's not a need for

18  Dr. Rone to testify.  Dr. Rone prepared a fairly detailed

19  report, the essence of which was that she did not see any

02:43:08  20  change in her post-arrest demeanor or mental well-being

21  compared to what she had seen prior.  It's a little more

22  detailed than that.

23          But she wasn't deposed so, you know, I don't know what

24  more we can do beyond her saying that she really didn't have

02:43:38  25  any -- her opinion is that she didn't have any real change in

1    her mental health status after the arrest compared with the way

2    it was before, which would encompass the prosecution and all

3    that, you know.

4              THE COURT:  The thing is, you know, similarly with

02:44:00   5    Dr. Rone, she's not going to testify as to the arrest itself or

6    anything that happened during the arrest, and what she would

7    testify to is that she doesn't believe that there are any

8    damages at all stemming from the prosecution on the aggravated

9    battery.  That's my understanding of what her testimony would

02:44:35   10   be, correct?

11             MR. WEILER:  Yes.  I mean, given the Court's rulings,

12   yeah, that's all she'll testify to.  If Dr. Robinson is

13   similarly limited, then so is Dr. Rone.

14             THE COURT:  All right.  Then number 2 is to bar

02:44:54   15   reference to Black Lives Matter, Ferguson, Missouri, Laquan

16   McDonald, or other related incidents.  I am granting that

17   motion to bar reference to -- Ms. Noel's reference to Women's

18   All Points Bulletin or any statement that she is an expert

19   witness on issues relating to the police.  I'll allow Ms. Noel

02:45:17   20   to testify as to what she's doing for work, you know, so what

21   she does for a living, which is working for Women's All Points

22   Bulletin.  However, I am going to limit her testifying to this

23   as background information.

24             So, you know, this can't be a vehicle to talk about

02:45:51   25   police misconduct generally, you know:  I created this

1   organization because I was the victim of excessive force.

2         She can't testify as to that.

3         MS. EKL:  But that limits then her doctors who say

4   that this All Points Bulletin and her work in creating All

02:46:16   5   Points Bulletin specifically to address those issues is

6   assisting in her recovery, and that's one of the things that

7   the doctor testified about.

8         THE COURT:  Okay.  So she can't testify to that

9   because, again, you know, at least from Ms. Noel's perspective

02:46:32   10   from what I understand and from what I've read, she founded

11   this organization and works with this organization because she

12   believes she herself was the victim of excessive force and

13   police misconduct, and there will be no argument as to that

14   there was excessive force here.  So, you know, that can't be

02:46:57   15   used as a vehicle to say:  Well, the reason I did this is

16   because I feel that Officer Coltri beat me up and that this is

17   how I'm dealing with that.

18         That can't come in.

19         MS. EKL:  Okay.

02:47:09   20         THE COURT:  All right?

21         MS. EKL:  Just because I want to make sure we don't

22   violate that, she can testify that what she's doing now is

23   working for an organization, Women's All Points Bulletin, and

24   she can testify as to what that is, what that organization does

02:47:27   25   generally, but not why she's part of that organization.

1    THE COURT:  Right, right.

2    MS. EKL:  Can she testify that that work itself,

3    without getting into specifics or without any mention about her

4    belief that she was the victim of excessive force, has assisted

02:47:46    5    in recovering, or is that something that --

6    THE COURT:  I think that walks too close to the line.

7    MS. EKL:  Okay.

8    MR. WEILER:  And so I'm clear, she can't get into any

9    of the details about what this organization does because it's

02:48:07   10    replete with --

11    THE COURT:  I mean, she can say generally.  So I'm not

12    sure exactly what the organization does, but that it assists

13    women that are victims of police misconduct.

14    THE PLAINTIFF:  Violence.

02:48:28   15    THE COURT:  Okay.  That's what you can say, that this

16    organization assists women who are victims of police violence.

17    THE PLAINTIFF:  And families.

18    THE COURT:  I'm sorry?

19    THE PLAINTIFF:  Women and families.

02:48:43   20    THE COURT:  Okay.  But that's the extent of it.  So

21    you can say that statement, but that's as far as we will go.

22    MR. WEILER:  I mean, I don't know what it does.  All

23    we can look at is the Facebook page and the Twitter pages

24    which, you know, all they do is recount instances of police

02:49:03   25    misconduct.

1          THE COURT:  Right.  But I just ruled, and I said

2     that's what she can say.

3          MR. WEILER:  Yeah.

4          THE COURT:  It is limited to that sentence.  She can

02:49:14  5     say that this is what the organization does.

6          MR. WEILER:  Well, my other concern, too, is that

7     members of the jury, despite the admonitions not to do research

8     on their own, are going to, you know, go home and look at this

9     website and see what it involves.  I know you can't --

02:49:35  10          THE COURT:  The thing is, you know, you trust juries

11     are going to follow the rules, and my experience is they tend

12     to follow the rules and not do their own investigation.

13     Moreover, if they were to go and do investigation, it would be

14     something, you know, much juicier than this.  You know, they'd

02:49:59  15     wait for something to really catch their attention.  So, you

16     know, they might go look at a crime scene, pull up a crime

17     scene.  You know, with something like that, maybe they'd be

18     tempted, but this is:

19          This is what I do for a living.  I work for Women's

02:50:21  20     All Points Bulletin.

21          And what is that?

22          It's an organization that assists women and families

23     who have been victims of police violence.

24          Then you move on.

02:50:30  25          MR. WEILER:  Okay.

1    THE COURT:  I don't think that they're going -- that

2    that's going to really pique their interest.

3         MS. EKL:  I'm sorry.  One more question.

4         THE COURT:  Sure.

02:50:38
5         MS. EKL:  Is she allowed to testify that she founded

6    that organization?

7         THE COURT:  No.

8         MS. EKL:  Okay.

9         THE COURT:  All right.  Number 4 is the motion to bar

02:50:58
10   evidence that Ms. Noel was terminated by AT&T due to this

11   incident.  I'm going to defer on this until I learn a little

12   bit more.  So I'm not sure what the basis is of Ms. Noel's

13   knowledge that connects her termination to this incident.  She

14   can't testify as to hearsay, to what somebody told her, and she

02:51:25
15   can't testify as to her own speculation.  So I'm not sure what

16   the basis of her knowledge would be.

17        MS. EKL:  We're not -- I mean, first off, she wasn't

18   terminated by AT&T, so I think there might be some confusion on

19   that.

02:51:40
20        THE COURT:  Okay.  My understanding is that she got a

21   layoff letter in early December that gave her 60 days to find a

22   job and that if she didn't have a job by February 9th then she

23   would be terminated.  So did she get a job with AT&T in a

24   different position with AT&T by February 9th?

02:52:03
25        MS. EKL:  No.

1       THE COURT:  All right.  Then what is the connection

2  between this incident and her not getting another position with

3  AT&T?

4       MS. EKL:  First off, she was supposed to have an

02:52:26   5  interview for another position shortly after the first of the

6  year and during one of the days that she was in custody for the

7  aggravated battery.

8       THE COURT:  Okay.

9       MS. EKL:  So that was the first instance.  Then

02:52:35  10  secondly is just the fact that this affected her emotionally

11  and impeded her ability to obtain any job after this event

12  because basically she was so distraught from the charges and

13  also the fact that she had these charges on her background that

14  she was going to have to now report.

02:52:56  15       THE COURT:  But that doesn't link to any decision by

16  AT&T, right?  So AT&T in early December said:  We are laying

17  you off, and we're giving you 60 days to apply for a different

18  position within AT&T.

19       So the fact that she did not get another position or

02:53:38  20  was not offered another position, you can't link AT&T's

21  decisions with this incident.

22       MS. EKL:  And I think there's two or maybe there's two

23  ways of looking at it.  One, yes, I understand that she can't

24  testify to the reason why AT&T didn't offer her a job, and

02:54:01  25  that's not what we're intending to do.  The issue is that since

1    this case occurred back in 2009 and until today, she still has

2    never been a whole person where she feels like she can work in

3    the same capacity as she did prior to this incident.  So her

4    testimony is going to be that she wasn't able to find a

02:54:19    5    position within AT&T and to pursue it and obtain it, nor was

6    she able to do that with other jobs as well where she had some

7    interviews.  So she just has never recovered from this incident

8    emotionally, and that has impeded her ability to get not just

9    this job but other jobs.

02:54:37    10    THE COURT:  Okay.  So she can testify to her own

11    emotional damages, right?  What she can't testify to is any

12    decision that was made by AT&T.  Okay?  If she -- you know,

13    even with the interview, I don't know that you can parse it out

14    because she was charged with the misdemeanor and the felony,

02:55:13    15    right?  So I don't know.  I mean, she could say:  I couldn't

16    participate in the interview because I was so upset about

17    having to deal with this felony charge.

18    But I don't know that she can testify, you know:  I

19    missed a particular interview because I was in custody.

02:55:51    20    She was in custody both for resisting arrest and the

21    aggravated battery.

22    MS. EKL:  But it kind of goes back to -- and I'm not

23    trying to argue with you.

24    THE COURT:  No.

02:56:02    25    MS. EKL:  If you don't mind if I just comment, the

1    aggravated battery was the reason why she had a high bond

2    amount, the reason why she was in custody and the reason then

3    why she couldn't go to the interview.  If she had been charged

4    with the misdemeanor, this would be an entirely different

02:56:17    5    situation, but all of this stems from the fact that this was a

6    felony offense charge.

7         THE COURT:  I understand that.  The problem is when

8    you're going back in time, you know, you can't say that

9    something different would have happened if you don't know that

02:56:32    10   something different would have happened.  So, you know, nobody

11   knows what would have happened had it simply been a misdemeanor

12   and not the misdemeanor and a felony.

13        So unless you can link it up and it's not -- unless

14   somebody can come in and testify, you know, that this is what

02:56:56    15   the bond amount was at that time for misdemeanors, that this

16   was what the bond amount was if it's a misdemeanor and a

17   felony, you know, Ms. Noel can't speculate on that or testify

18   as to what she thinks it would have been.  Okay?

19        MS. EKL:  Okay.

02:57:16    20        THE COURT:  Then with regard to the census worker, you

21   know, the letter, she'd have to lay a foundation for the

22   letter.  Again, any argument that the Census Bureau declined to

23   hire her based on the arrest for aggravated battery as opposed

24   to the arrest for resisting arrest is speculation because the

02:57:46    25   letter doesn't say one way or the other.  It just says:  Based

1  on the review of your arrests, we can't hire you as a temporary

2  worker.

3      So it doesn't specify what the arrests are and what

4  the basis for the decision is.

02:58:09  5      Okay.  Then number 7 is to bar witnesses or evidence

6  that wasn't disclosed.  So I don't believe at this point that

7  there's anything else that hasn't been disclosed.  So the

8  witnesses are Pamela Tolbert, Maurice Allen, Dr. Greider,

9  Dr. Smith, Maldon Noel, and Dr. Robinson.  There's nobody else,

02:58:42  10  is that correct?

11      MR. WEILER:  I don't think Maldon Noel was listed as a

12  witness.

13      MS. EKL:  Right.

14      MR. WEILER:  I think that's her relative.

02:58:51  15      MS. EKL:  Right, we did not list Maldon.

16      THE COURT:  All right.  But there is nobody else out

17  there.  That's it.

18      MS. EKL:  Nobody else that we intend to call, no.

19      THE COURT:  All right.  I'm going to deny this motion

02:59:10  20  just because, you know, I do know that Ms. Noel was for a

21  significant amount of the case representing herself.  But I

22  will limit her to, you know, everyone that she has disclosed at

23  this point and nobody else.

24      Number 8 is to bar Ms. Noel from offering hearsay

02:59:37  25  testimony as to what her doctors told her.  So I'm granting

1   that motion in that she can't offer any self-diagnosis, and she

2   can't testify to what her doctors told her about her

3   conditions, her symptoms, and her prognosis.  What she can

4   testify to is her own experiences:  These are my symptoms.

03:00:03   5   This is when they started.  This is the extent of my symptoms.

6   This is what I experienced.

7       So she can testify as to that, but she can't testify

8   as to what her doctors told her because that's clearly hearsay.

9       MS. EKL:  What about to the extent that she has

03:00:20   10   changed aspects of her life as a result of what the doctors

11   told her to do?  So I would anticipate she would say:  The

12   doctor told me that I suffer from X and so, therefore, these

13   are the steps that I have to take to try to overcome that.

14       THE COURT:  Well, I think, you know, she can testify

03:00:42   15   as to:  Based on what my doctors told me, I have taken these

16   steps.  So based on what my doctors told me, I have started

17   doing yoga and meditation and, you know, I've taken these steps

18   in my life to address the injuries that I have.

19       That's fine.  What she can't say is:  My doctors told

03:01:12   20   me I've got X, Y, and Z.

21       You know, her doctors can testify as to what they told

22   her, but she cannot.

23       MS. EKL:  Understood.

24       THE COURT:  All right.  Number 9 is to bar arguments,

03:01:26   25   speculation, or claims that any video record of the incident

1    existed.  My understanding is that there is no video, that the

2    video equipment was not working in the car.

3            MR. WEILER:  Right.  Frankly, I don't even know if

4    there was video equipment in this car, and that's what he

5    testified to a year later or whenever the trial was.  The

6    department was only just getting video equipment in some of

7    their cars when this happened.  But, yeah, there is no video.

8            THE COURT:  So then we're not going to, you know, go

9    into any testimony or questioning about whether there should

10   have been a video or should not have been a video.  There

11   wasn't a video.  There's been no evidence that he, you know,

12   created a video and destroyed the video or that he consciously

13   did not take a video when he could have.  It wasn't -- at least

14   according to his trial testimony, the video equipment was not

15   working.  There is no video.

16           So I think to even get into whether there was a video

17   or should have been a video or anything like that is just going

18   to cause the jury to focus on a video that doesn't exist as

19   opposed to what happened during the interaction and what was

20   the basis of the aggravated battery charge, so was it made up

21   or was there a basis in fact.  I mean, it's a simple, simple,

22   simple trial, so it shouldn't take very long.  You know, that's

23   what we're focused on.  So whether there was a video or should

24   have been a video, I think it's just a complete peripheral area

25   of questioning.

1      Number 10 is to bar argument or evidence of a code of

2   silence.  I'm granting that in part and denying it in part.  So

3   there shouldn't be any testimony or questions about a code of

4   silence.  However, certainly any questions regarding bias are

03:03:54    5   appropriate, so I will allow that.

6      Number 11 is to bar the use of general orders,

7   policies, or guidelines.  What do you think that the evidence

8   is going to be with regard to that?

9      MR. WEILER:  I don't think there is any evidence of

03:04:16   10   it.

11      MS. EKL:  That's because they've never produced the

12   documents that were requested for the general orders and so

13   forth.  To the extent that they're going to talk about -- to

14   the extent that it's brought up through the course of Officer

03:04:34   15   Coltri's testimony and if he's going to talk about his training

16   or that he acted in a proper manner, I think that we should be

17   allowed to explore that.  So he just can't say -- well, we

18   should be able to explore it.

19      We're not trying to say that if he didn't act

03:04:52   20   consistently with some general order that that constitutes a

21   constitutional violation.  I know that we can't do that, but I

22   think it will help establish malice if he's not acting

23   consistently with the policies and if he testifies, you know:

24   Consistent with my general orders, I had to pull up onto the

03:05:14   25   apron of this parking lot, and I'm always required to run her.

1      If that's contradicted by someone else who testifies,

2  I think we should be able to explore that.

3      MR. WEILER:  Well, we made an objection years ago on

4  the basis that we didn't believe that they were relevant to the

03:05:32  5  questions that were relevant to any of the issues or the claims

6  that were being made.  That was never contested.  That was

7  never pursued.  So to start now with, you know, questioning him

8  about policies, you know, I don't know that there even are any.

9  We certainly aren't going to contend that, you know, there

03:06:01  10  were, you know, these policies, specific departmental policies

11  that he was required to follow or didn't follow or explain why

12  he didn't follow them.

13      It is in that sense a simple case.  There was this

14  interaction with Ms. Noel, this incident that occurred, and he

03:06:26  15  contacted the state's attorney regarding the felony charge,

16  described what happened, got approval for the felony charge,

17  and that's what she was charged with.  So there's not going to

18  be -- this isn't a policy case where you have to discontinue a

19  pursuit because it was putting somebody's life at risk or

03:06:53  20  anything like that.  It just isn't that kind of a case.

21      THE COURT:  Okay.  I agree that this is a very simple

22  and pretty straightforward case, so I, you know, don't believe

23  that there's going to be much testimony about any policies or

24  general procedures or anything else.  He'll testify as to what

03:07:19  25  he did, you know, that he pulled over, you know, that he came

1      as backup and pulled over, that he engaged with Ms. Noel, and

2      what happened.

3              You know, his testimony will be that she chest bumped

4      him.  Her testimony will be that that did not happen, that she

03:07:44    5      didn't do that.  Then he'll testify, you know:  I told the

6      state's attorney this is what happened, and I got felony

7      charges.

8              In the end, the jury will either believe Ms. Noel,

9      believe that that didn't happen and that he pursued these

03:08:04    10     felony charges out of malice, or they'll believe him that it

11     did happen and that there was a factual basis and probable

12     cause for the charges and the pursuit of the charges, and then

13     he wins.  So, you know, it's going to be fairly

14     straightforward.

03:08:26    15             MS. EKL:  I agree.  I think it's just that the motion

16     in limine was pretty broad, and I expect that there will be

17     questions, for instance, about his reports.  Maybe they'll

18     believe that his reports are accurate or complete, but we

19     should be entitled to ask questions about the fact that he's

03:08:45    20     required as a police officer to fill out accurate and truthful

21     reports.  So that would be the extent of it.

22             THE COURT:  Sure.

23             MS. EKL:  Not beyond that, to say that it's

24     unconstitutional or beyond that.

03:08:56    25             THE COURT:  Right, that's fine.

1      MR. WEILER:  And that kind of raises a question as to

2   one of the -- it relates to one of the exhibits.

3      THE COURT:  Well, why don't we get to the exhibits

4   later.

03:09:09   5      MR. WEILER:  Okay.  That's fine.

6      THE COURT:  Okay.  Then number 12 is to bar evidence

7   or argument that Ms. Noel suffered physical or emotional

8   injuries caused by his use of force.  We've gone over that ad

9   nauseam.  Again, she can't testify that he used excessive

03:09:36   10   force.  She can't get any damages or argue for damages from any

11   physical injuries that resulted from the arrest or any

12   emotional injuries resulting from the arrest, only the

13   emotional injuries resulting from the prosecution.

14      Then number 13 is to bar evidence of her academic

03:10:05   15   record.  Again, that's denied.  It can be that she can talk

16   about where she went to school, just as Officer Coltri can talk

17   about where he went to school.  It's simply background.

18      Then I'm granting number 14, which is to bar argument

19   that the Westchester police racially profiled Pamela Tolbert.

03:10:33   20      Okay.  So having gone through those, I don't believe

21   that there are any objections to any of the will call or may

22   call witnesses on either side.

23      MS. EKL:  Yes, there is now by us.

24      THE COURT:  Okay.

03:10:49   25      MS. EKL:  So, Your Honor, we have an objection to

1    Dr. Broadnax's testimony.  He is listed as E3 on page 4.

2         MR. WEILER:  We're not going to call Broadnax.

3         MS. EKL:  Broadnax only testified related to physical

4    injuries.

03:11:06   5    THE COURT:  Okay.  So then no objections by the

6    defendants to any plaintiff's witnesses.

7         MR. WEILER:  No.

8         THE COURT:  Okay.

9         MR. WEILER:  I mean, Maurice Allen is listed as a

03:11:36  10   witness who's going to testify to her reputation for

11   peacefulness, which I think has a lot to do to a limited extent

12   in the criminal trial where it might be relevant, but I don't

13   see that that would be relevant at all here.  He's a co-worker.

14   She can't put on evidence that she was a peaceful person under

03:12:01  15   the rules of evidence.

16        THE COURT:  What would be the subject of his

17   testimony?

18        MS. EKL:  We'll withdraw Maurice Allen.

19        THE COURT:  All right.  Then with the voir dire

03:12:23  20   questions, I think you got those.  So with number 1, we cover

21   that in our questions.  Number 2, I added.  Number 3, we added

22   more broadly as just asking if anybody -- so that's number 13,

23   whether anybody has had any experience, either favorable or

24   unfavorable, with the City of Westchester that might prevent

03:13:09  25   them from being a neutral juror.

1        Number 3, we need to add that.  Yes, we'll need to add

2    number 3.

3        THE CLERK:  Number 3?

4        THE COURT:  Right here (indicating).

03:13:35    5        MR. WEILER:  From ours.

6        THE COURT:  From theirs, yes.

7        MR. WEILER:  From the final pretrial order.

8        THE COURT:  Number 4, we added it.  So that's number

9    14.  Number 5, we have covered it already in number 11.  Number

03:14:04   10   6 and number 7, I'm not going to ask.  Number 8, we have

11   covered it by number 11.  Number 9 is our number 12, and I

12   think that also covered your proposed number 10.  Numbers 11

13   and 12 are covered, I think, by our 15 and 16, and that also I

14   think covers number 13.  Then number 14 is our number 18.

03:15:16   15       MR. WEILER:  Just in terms of how you do voir dire, do

16   you only request ask the questions, or do the attorneys follow

17   up?

18       THE COURT:  So I ask the questions, and I will

19   question the entire venire and then allow you to -- we'll them

03:15:41   20   back anybody who says, you know:  I want to skip it.  I don't

21   feel comfortable answering, you know, question 11.

22       So anybody who wants to talk to us privately, we call

23   them back in.  Anybody that based on their answers you want to

24   ask follow-up questions to, we'll also call them back in.  So

03:16:06   25   we do that one at a time.  Then I'll take any challenges for

1    cause, and then I'll have you exercise your peremptories.

2        So the only thing that I ask, because this process

3    takes awhile because I'm questioning all the potential jurors,

4    as you're going through it, make whatever indications you need

03:16:34    5    to make to do your peremptories quickly.  Whether it's sticky

6    notes, whether it's multicolored pens or highlighters, whatever

7    it is, whatever system works for you, use that system as we're

8    questioning.

9        What happens is we go through this whole process, I

03:16:54    10    send all the jurors out into the hallway, and then, you know,

11    we bring people in one at a time.  At that point, the jurors

12    are ready to lose their minds.  So if you're thinking of saying

13    you need 20 minutes to come up with your peremptories, it's not

14    going to fly.  I'm literally going to give you less than five

03:17:15    15    minutes.

16        So as you are going through this, just identify the

17    people you want to strike.  You know, whisper to each other as

18    it's going on so that you can exercise the peremptories fairly

19    quickly at the end.  So I'm just giving you a heads-up.

03:17:33    20        MR. WEILER:  So any follow-up questions by the

21    attorneys will be done on a single juror basis.

22        THE COURT:  A single juror basis afterwards.

23        MR. WEILER:  Okay.

24        THE COURT:  Okay?

03:17:52    25        MR. WEILER:  Yes.

1    THE COURT:  I do find, you know, the system takes a

2    little longer, but I think it makes more sense.  You know, you

3    can exercise your peremptories in an intelligent way.  You're

4    not doing it by panel, so you know exactly who's in the pool.

03:18:08    5    MR. WEILER:  What's the size of the voir dire?

6    THE COURT:  Oh, I'm trying to remember.  I think it

7    may be 28 or 30.

8    MR. WEILER:  Okay.  Thank you.

9    THE COURT:  Okay.  Now to the exhibits, all right.  So

03:18:34    10   with plaintiff's exhibits, we've got Exhibit 2 which Ms. Noel

11   is only using to impeach or refresh her recollection, is that

12   correct?

13   MS. EKL:  Correct.

14   THE COURT:  Okay.  So then I'll overrule the

03:18:58    15   objection.  On the Officer Coltri's report, what he writes in

16   there would be the statement of a party opponent, so it would

17   not necessarily be hearsay.

18   MR. WEILER:  And just so we're clear as to what that

19   is, you told me this was Exhibit 3 (indicating).

03:19:40    20   (Discussion off the record.)

21   THE COURT:  What I have in here is a case report.

22   MR. WEILER:  Right, case information.  Yeah, I think

23   that's the same thing.

24   MS. EKL:  That's it, Judge.

03:19:58    25   THE COURT:  Okay.

1  MS. EKL:  It may or may not, just to the extent
2  needed.

3  THE COURT:  Okay.  It doesn't really give much
4  information.  So any of these, though, that you are using, you
03:20:12  5  do need to make sure they're redacted because I see Ms. Noel's
6  Social Security number on here.

7  MS. EKL:  Right.

8  THE COURT:  So that information needs to be redacted.
9  You need to go through those.  Okay?

03:20:31  10  Then No. 4, the property form, I'm not sure why this
11  is relevant.

12  MS. EKL:  Your Honor, I think we put it in here to the
13  extent Officer Coltri may -- if he denies what the plaintiff
14  was wearing at the time.  In terms of, you know, what happened
03:21:04  15  at the scene, she lost her hat in the course of things.  It
16  fell off of her.  It's if for some reason there's something
17  that we'll need to refresh someone's recollection on in
18  general.  In general, there probably won't be any reason other
19  than the fact that it's missing, that her cell phone is missing
03:21:26  20  on here.  So that may become relevant given the testimony.

21  THE COURT:  Okay.

22  MR. WEILER:  I don't know what --

23  MS. EKL:  You know, actually, I'm sorry.  May I have
24  one moment?

03:21:40  25  (Discussion off the record.)

1    THE COURT:  But the cell phone is listed on the case
2  information report, Exhibit 3.
3    MR. WEILER:  Right.  I think the testimony by Ms. Noel
4  was that she took photographs using her cell phone at
5  Westchester PD.
6    THE PLAINTIFF:  But they didn't know.
7    THE COURT:  Okay.  So I'm not sure why that would be a
8  problem.
9    MS. EKL:  It's just a part of the case, Your Honor,
10  and to the extent it becomes necessary because of the
11  testimony.  There's nothing specific at this point in time that
12  I see.
13    THE COURT:  Okay.  So, I mean, I guess if you need to
14  use it to refresh recollection, I don't know that -- we'll see
15  how it goes.  I'll rule on it at trial.  I mean, this is a
16  plastic bag, just a plastic bag containing various items, and
17  the ChapStick and phone look like they're in a separate bag.
18    Okay.  The refusal to sign form, why is this relevant?
19    MS. EKL:  It may become relevant.  To the extent that
20  Ms. Noel wasn't given the opportunity to get her cell phone
21  back, this is the property form that she didn't sign, that she
22  refused to sign, and her cell phone wasn't on there.  Also, the
23  reason that she wasn't able to call and cancel her appointment
24  for her job interview was because she wasn't given her cell
25  phone.  So it may or may not become relevant.  Obviously, she

1  can testify about certain circumstances, but if it's disputed

2  that that cell phone was not returned to her, we may need this

3  to refresh the officer's recollection or to impeach him.

4          THE COURT:  All right.  But there's other things that

5  are not listed here either, right?  So the gloves, hat, scarf,

6  $22, that's not listed on here, either.

7          MS. EKL:  Right, those were, I believe, released to

8  Pam Tolbert.  So she signed the bottom of that release form.

9          THE COURT:  Okay.  The car tow report, number 7, why

10  is this relevant?

11          MS. EKL:  It identifies the car that she was driving

12  at the time.  To the extent that memories need to be refreshed

13  as to what car she was driving, that would be the only reason.

14          THE COURT:  All right.  You can use that to refresh

15  recollection.  The census letter, at this point I'm not

16  allowing it in.

17          Then the photos?

18          MS. EKL:  Those photographs that are in your binder,

19  Your Honor, we put the wrong photographs in there, so we

20  replaced them.

21          (Discussion off the record.)

22          MS. EKL:  I think what was provided to you was the

23  grouping of photographs from the scene and of her injuries, and

24  the only ones that are being objected to are in relation to her

25  injuries.

1    (Discussion off the record.)

2    MS. EKL:  Is that correct?  Those are the only ones

3  that you're objecting to?

4    MR. WEILER:  Right, the photos of the injuries.  Do we

5  have 9?  We weren't able to identify what No. 9 was.

6    MS. EKL:  We withdrew some of those, so we can go

7  through them.

8    MR. WEILER:  Okay.

9    MS. EKL:  So there should be a 10A through 10J

10 that we are submitting to show her injuries.  Those are the

11 ones that defendants were objecting to, and I did provide them

12 with a copy of the specific photographs so they would know.

13    Did I hand you the wrong thing, or is that the old

14 group?

15    THE CLERK:  You handed me photos from the scene.

16    MS. EKL:  Okay.  Let me give this to you.  This is

17 what it is (indicating).

18    THE COURT:  Okay.

19    MS. EKL:  I apologize.

20    THE COURT:  Okay.

21    MS. EKL:  And consistent with Your Honor's ruling, we

22 don't intend to introduce any photographs of injuries to ask

23 for recovery.  They're just to show that in the course of what

24 was going on she did have physical injuries, that Officer

25 Coltri would have been able to see those injuries, and that it

1   would have provided the motive for him to charge her with

2   something more serious to suggest that this was her fault

3   rather than that it was the result of a scuffle.  It provides

4   motive for malice, that he's trying to cover up what happened.

03:28:32   5   THE COURT:  Okay.  What's the basis of the defendant's

6   objection?

7   MR. WEILER:  Well, what we argued before, that her

8   injuries are not relevant under Heck, given the rulings on the

9   excessive force claim and the fact that she was found guilty of

03:28:54   10  resisting arrest and the Appellate Court's commentary that the

11  injuries that she sustained were consistent with her resisting

12  arrest, it can only confuse the jury.  Our concern is that

13  they're going to believe that she's putting this in to recover

14  those injuries and, you know, that's not permissible.

03:29:27   15  THE COURT:  No.  What I can do is give a limiting

16  instruction at the time that any photographs that you intend to

17  show, any photographs of any injuries, to provide a limiting

18  instruction to the jury to say that they are only to consider

19  this as a possible motive for malice and that they are not to

03:29:56   20  consider this as a basis for any damages if they find in

21  plaintiff's favor.

22  MR. WEILER:  Is that limiting instruction something

23  that the Court will come up with, or do you want the parties to

24  draft something?  You know, we didn't.  It didn't come up

03:30:24   25  because we hadn't had the rulings on the motions in limine yet.

1       THE COURT:  Well, how about this?  If you want to

2   draft something that you find agreeable with each other, then

3   I'll read it, and if I want to make changes I will.

4       MR. WEILER:  I'm thinking at least from our

03:30:39  5   perspective that we may want an instruction upfront at the

6   beginning of the case as to what they're to consider and what

7   they're not to consider in terms of physical injuries and

8   things like that, given the Court's rulings.

9       MS. EKL:  Well, we would object to a preview.  They

03:30:59  10   have to consider the totality of what happened in the context

11   of the arrest for aggravated battery.  I think that it's

12   appropriate to give a limiting instruction when the photographs

13   come in.  Again, we're not going to be seeking or we're not

14   going to be asking the jury for any relief related to the

03:31:15  15   physical injuries, and we'll make it clear why they are being

16   introduced.

17       THE COURT:  Yes.  So I think it's appropriate to give

18   that limiting instruction right before the photographs come in

19   to say that this is the only reason they are to consider these

03:31:31  20   photographs, you know, not at the outset.  Okay?  If you want

21   to draft something, I'm happy to look at it.

22       All right.  Then what's the objection to Officer

23   Coltri's testimony at the preliminary hearing?

24       MR. WEILER:  It sounds like they want to use it --

03:32:08  25   let's see where we're at here -- to use it for impeachment

 1   purposes.

 2           THE COURT:  They can use it for impeachment purposes,

 3   but they can also use it for evidentiary purposes as well, not

 4   simply impeachment, because it's a statement under oath.  So

03:32:38  5   that would go for any of his prior testimony, either at the

 6   preliminary hearing or at the criminal trial.

 7           MR. WEILER:  And that would be true for the

 8   plaintiff's testimony as well then.

 9           THE COURT:  Yes.  It could be used for impeachment and

03:33:00 10   then, you know, as substantive evidence of what was said.

11           MS. EKL:  I would just ask that counsel identify that

12   if he has not identified any such testimony he intends to

13   introduce against the plaintiff.

14           MR. WEILER:  I mean, it would be her testimony at

03:33:14 15   trial.  I can produce a copy to you.

16           MS. EKL:  Okay, as long as I know that's what it is.

17           MR. WEILER:  Sure.

18           THE COURT:  Sure.  Okay.

19           MS. EKL:  I'm sorry, Judge.  Before you move on to

03:33:25 20   defendant's exhibits, I don't know if you're at that point, but

21   we did provide them with an additional exhibit that we'd like

22   to introduce.

23           THE COURT:  Okay.

24           MS. EKL:  This would be No. 16.  This is a felony

03:33:36 25   minute sheet.  It's our understanding, although counsel could

1  not confirm it today, that this is a statement by Officer

2  Coltri that was typed by him.  So we would be using it to

3  either impeach him or as a statement of a party opponent.

4  THE COURT:  Any objection to this?

03:34:14
5  MR. WEILER:  I don't know that I have one.  We were

6  given it just a few minutes before we started today.  I'll have

7  to confirm with Officer Coltri whether this is something he

8  prepared or not.

9  THE COURT:  All right.  Well, confirm it and then let

03:34:40
10  me know.

11  MR. WEILER:  So this is No. 16, you say?

12  MS. EKL:  It will be No. 15.

13  MR. WEILER:  15.

14  MS. EKL:  And I guess if it is not Officer Coltri's,

03:34:49
15  we'd still ask that it be left in as an exhibit.  If defense

16  counsel intends to call the state's attorney who was identified

17  as a witness, we may use it with him to refresh his

18  recollection.

19  THE COURT:  Okay.  That's fine.

03:35:02
20  MS. EKL:  I'm sorry.  One more.  We don't have it

21  identified in here because we didn't have a current set of

22  bills, and that might be something that we can stipulate to,

23  but that would be something else that I just wanted to

24  highlight to Your Honor.  We are trying to gather whatever

03:35:18
25  bills exist relating to her psychological injuries related to

1    those two doctors that are going to testify.

2         MR. WEILER:  Well, the only bills that we've ever

3    gotten are what we subpoenaed from Dr. Robinson, what we got in

4    response to the subpoena which was limited to December 2014 --

5    the calendar year 2014, I believe.  That's all I've seen.

6    There's no treatment records after that.  There's no bills

7    after that.

8         Dr. Greider, is that the other doctor you're referring

9    to?

10        MS. EKL:  Correct.

11        MR. WEILER:  Again, we only have what we subpoenaed

12   from her office, but all of those were for -- actually, I

13   shouldn't say all of them, but the vast majority of those were

14   for physical injuries or complaints related to physical

15   injuries.  I think she may have prescribed Xanax early on.  So

16   I guess, you know, we would object to that.  I don't think she

17   can recover for those things, at least the way -- there's no

18   way to separate that out.

19        MS. EKL:  Well, our position would be that she went

20   there for the purposes of -- whatever she's going to be able to

21   testify to in relation to psychological or emotional damages

22   that my client suffered as a result of being charged with that

23   aggravated battery, she should be able to recover.  She should

24   be able to recover what it cost for her to go see the doctor

25   for those purposes, and that would include, it's my

1    understanding at least in relation to Dr. Robinson, that she

2    has seen Dr. Robinson, you know, somewhat recently.  So I do

3    believe that there will additional bills that we just don't

4    have at this point in time and that we'll have to obtain from

03:37:18    5    Dr. Robinson, so we're in the process of doing that.

6        THE COURT:  You know, the issue is that Ms. Coltri --

7        MR. WEILER:  Ms. Noel.

8        THE COURT:  I'm sorry.  Ms. Noel was going to see

9    Dr. Robinson not simply limited to whatever injuries she

03:37:46    10    suffered, emotional injuries she suffered as a result of the

11    aggravated battery charge, you know.

12        MS. EKL:  I think that's true early on, maybe in the

13    beginning.  But again, I think this will come out through

14    testimony, and the testimony is going to have to support the

03:38:05    15    bills.  But if after she, you know, serves whatever sentence on

16    her misdemeanor charge she continues to fight and continues to

17    feel the weight of these felony charges and how it's affected

18    her life, those are her damages.  So she's going to say:  I

19    went to the doctor as a result of the fact that I have never

03:38:28    20    gotten over this incident and specifically the fact that I was

21    charged with a felony.

22        So if that is, in fact, the proof we get from the

23    doctor, we should be able to then recover for the cost to her

24    to go to the doctor for the treatment.

03:38:42    25        THE COURT:  Well, I would need to see those bills

1   before they get submitted and I would have to hear from

2   Dr. Robinson, because this case encompassed a whole lot more

3   than just the aggravated battery charge.

4           You know, it has gone on for nine years and there were

03:39:12   5   a lot of claims that Ms. Noel brought in this lawsuit, but at

6   this point we are only looking at these two claims.  So as the

7   case progressed and as time has gone on and, you know, Ms. Noel

8   has seen Dr. Robinson, I think it would be very hard to parse

9   out from the bills, you know, if you're seeing her for 50

03:39:47   10   minutes, how much of that 50 minutes you're dealing with, you

11   know, the fallout from the aggravated battery charge as opposed

12   to Ms. Noel's belief that Officer Coltri used excessive force

13   on her, Ms. Noel's belief that she should not have been

14   arrested, or Ms. Noel's belief that she was the victim of

03:40:18   15   police misconduct.  I mean, that's all part and parcel here,

16   and the majority of that, she cannot recover for those things.

17           So I think in some ways the bills would be misleading

18   to the jury, you know, unless Dr. Robinson can say:  I estimate

19   that we spent a percentage, whatever percentage of our time,

03:40:51   20   dealing with these issues relating to the felony charge.

21           To put in all the bills is -- there's a substantial

22   amount of that that Ms. Noel cannot recover on.  So I would

23   want to hear the testimony and I would want to see the bills

24   before I would allow the bills in.

03:41:12   25           MS. EKL:  Okay.

1     MR. WEILER:  I would also point out that when I

2  deposed Dr. Robinson, she had seen her -- she was deposed in

3  2015, near the end, November, I believe.  She had only prepared

4  one report.  That was the sole record, and that was prepared in

03:41:32    5  December 2014.  I mean, she said she doesn't keep notes of

6  individual visits.  This was a summary of the whole year or

7  whatever that part of the year was of treatment.

8     So I don't know how we would ever be able to even

9  cross-examine her.  We haven't gotten any records after that

03:41:54   10  December 2014 report.  There's nothing after that that I've

11  seen, and I don't know how we could even examine her on what

12  would be related solely to the prosecution for aggravated

13  battery which ended at the trial in 2010.

14     There was an appeal of the resisting charge which

03:42:19   15  continued the legal process for a long period of time when it

16  went up to the Appellate Court and back down, but that was for

17  resisting.  So any emotional distress from the continuation of

18  that legal process isn't related to the aggravated battery.  So

19  I just don't know how we can do that, so I would object on that

03:42:44   20  basis, also.

21     THE COURT:  All right.  Let's move on to defendant's

22  exhibits.  So the booking and processing papers, the objection

23  is that it's hearsay and unduly prejudicial.

24     MS. EKL:  Correct.  If they were just going to use it

03:43:08   25  to refresh someone's recollection, that's one thing.  But I

1    think the reality is they're trying to use this to show this

2    photograph to somehow suggest that she was not distraught by

3    this incident.

4                As we all know, capturing a photograph of someone, you

03:43:25   5    know, we don't know what's going on at the point in point that

6    the photograph was being taken in the booking room.  You know,

7    someone could have said anything that caused her to be smiling.

8    That doesn't prove that she was upset or distraught by what

9    happened to her.  I don't what else -- I mean, they can

03:43:45   10   articulate why they are trying to introduce this document, but

11   I believe it's for the photograph, and I think it's unduly

12   prejudicial.

13               MR. WEILER:  I mean, this photograph is as relevant as

14   any other photograph of the plaintiff that was taken on the day

03:43:59   15   of her arrest.  It shows her appearance at that time.  Any

16   photograph is going to be literally a snapshot at a point in

17   time of the person, so I don't know that that's a valid basis

18   to exclude this.

19               THE COURT:  So I don't see that it's unduly

03:44:19   20   prejudicial.  It's a photograph that reflects Ms. Noel at the

21   police station while she's getting her mug shot taken.  It

22   shows the abrasion up near her temple.  Just as I am allowing

23   the photographs that she took of herself right after the

24   arrest, you know, this one is just as relevant, particularly if

03:45:09   25   Ms. Noel is claiming, you know, emotional damages from being

1   arrested for and prosecuted for aggravated battery.  This is

2   relevant to show what her state of appearance was at that time

3   and, you know, you can certainly cross whoever took the photo.

4           MS. EKL:  Well, they don't intend to call the person

03:45:42  5   who took the photo.  They don't have that person identified, so

6   we don't know what was going on at this point in time.  This is

7   not with Officer Coltri.  This is while she's talking to a

8   booking officer in the course of getting her booking photo

9   taken.

03:45:57  10          THE COURT:  And you can ask Ms. Noel what she was

11  thinking or doing at that time.

12          MR. WEILER:  Right.

13          MS. EKL:  Well, I guess the point is plaintiff getting

14  up and then arguing something differently, that they don't have

03:46:09  15  testimony to say:  This shows her demeanor.  Look at her

16  demeanor.  She is happy.

17          If there's no testimony to support that and if that is

18  the case, then the jury is going to be left to speculate that

19  because her mouth is a little bit open and it looks like she's

03:46:26  20  smiling.  She's not smiling, and they shouldn't be allowed to

21  argue that.  I mean, this is a --

22          THE COURT:  Well, what they can argue is that, you

23  know, Ms. Noel testified that she was really surprised and

24  upset at being charged with a felony and that she did not do

03:46:49  25  what Officer Coltri said she did, and they can then show this

1    photograph and say that was the booking photograph.

2         You know, basically this comes down to a credibility

3    contest between Ms. Noel and Officer Coltri.  So they can argue

4    from this photograph that, you know, you can look at this

5    photograph and see that she didn't seem upset and, you know,

6    take that for what it is.  Ms. Noel can certainly testify as to

7    what was happening when this photograph was taken.  She can

8    explain what she is feeling at the time and what she thought

9    about it at that time.  She can testify to that.

10        All right.  So with all of them, you need to redact

11   her personal information.

12        MS. EKL:  Right.

13        THE COURT:  So her driver's license number, her Social

14   Security number, all of that, her date of birth.

15        All right, the information and indictment return

16   sheet.

17        MS. EKL:  We're withdrawing our objection to that one.

18        THE COURT:  Okay.

19        MS. EKL:  Oh, I'm sorry.  Wait.  I might have

20   misspoke.  Actually, no, I take that back.  We withdraw the

21   objection to the last two pages.  The information, what the

22   charges include, which is, I guess, Defendant's 6 and 7, we

23   have no objection to that.  But the first pages, 4 and 5, you

24   know, that there was a finding of probable cause, all this is

25   prejudicial and is hearsay.

1          THE COURT:  Okay.

2          MR. WEILER:  It was all part of the same document.

3    That's why we included it.  So we can submit 6, 7, and 8

4    instead.

5          THE COURT:  Okay.

6          MR. WEILER:  Defendant's 6, 7, and 8.

7          THE COURT:  Okay.

8          MR. WEILER:  It's just the signature page.

9          THE COURT:  All right.  That's fine.  So it will be

10   Defendant's 6, 7, and 8.

11         MR. WEILER:  Let's see.

12         THE COURT:  All right.  Then the next objection is to

13   E.

14         MS. EKL:  We have an objection to D, which is the

15   Google map, just to the extent that a proper foundation needs

16   to be laid.  These are Google maps from 2019.  I believe Google

17   offers maps that are more recent in time to our event.  I mean,

18   I understand that they would be able to use it to show the

19   relation of streets to one another, but there are a number of

20   things in here that are not -- that were not present, including

21   the bright white striping on the street.

22         So they would need to lay a foundation or at least

23   introduce it for the limited purpose of showing the

24   relationship of the streets to one another and not for the

25   purpose of showing that there were white parking stripes on the

1    street at that time.

2        MR. WEILER:  And, you know, our intent was only to use

3    it for demonstrative purposes.  In that regard, I agree.  You

4    know, at least I don't think those white stripes were there,

03:50:48    5    and if there's a way to find photographs from Google that are

6    far more closer to the date of the incident, I'd be thrilled to

7    use those.

8        THE COURT:  Okay.

9        MR. WEILER:  I'm just not technically or

03:50:58    10    technologically advanced enough to know how to find those on

11    Google.

12        MS. EKL:  So the person who's going to be testifying

13    about this, you know, if they're asked does this accurately

14    show the scene and they say except for that these things

03:51:15    15    weren't there, that would suffice.

16        MR. WEILER:  Except for the stripes, yeah, that's

17    fine.  That's all it was going to be used for, just that.

18        THE COURT:  That's fine.  All right.  The police radio

19    traffic?

03:51:29    20        MS. EKL:  Our objection to that is it doesn't prove a

21    fact at issue.  It's not going to assist the jury.  It's a

22    limited portion, a couple little snippets of Coltri calling

23    over the radio.  You hear some noise in the background without

24    any context as to what point in time in the interaction it is,

03:51:49    25    and it's unduly prejudicial.  It's not like a 911 call that's

1      going to explain why someone is doing something.  It's just a

2      very small portion.  I don't know if counsel provided it for

3      you to hear.

4                  THE COURT:  I have it here.

03:52:03    5      MS. EKL:  Okay.

6                  THE COURT:  So what are you going to be using it for?

7                  MR. WEILER:  So it's the only thing we have which is

8      actually during the arrest.  It is, you know, part of the whole

9      res gestae of the arrest itself.  Officer Coltri is calling for

03:52:24   10      assistance.  You can hear yelling in the background.  If he's

11      being charged with having maliciously prosecuted somebody, I

12      think, you know, the jury is entitled to hear it for what it is

13      and give it whatever weight they want to give to it.

14                  THE COURT:  Is there -- does this cover the entire

03:52:49   15      radio traffic from the start of the encounter to the end?

16                  MR. WEILER:  I think it covers the -- I don't think it

17      covers the traffic stop, for example.  It covers just Coltri's

18      involvement when he calls in.

19                  THE COURT:  Right.  That's what I'm asking.

03:53:11   20                  MR. WEILER:  I believe so.  I'd have to verify that.

21                  MS. EKL:  The problem is it's after.  He's calling for

22      assistance.  It doesn't include -- excuse me -- it doesn't

23      include what's happening that led to her arrest.  So to the

24      extent here they're going to argue you can hear her yelling in

03:53:36   25      the back, this is after she's already in the back and after

1    there's been a struggle.  So it's entirely misleading, and it's

2    a millisecond that you hear.  So it's going to be subject to a

3    number of interpretations as to something that isn't even at

4    issue in the case.  You know, what the --

03:53:52    5    THE COURT:  Well, what's at issue is what happened

6    during the arrest or during the stop and whether Ms. Noel

7    physically engaged with Officer Coltri in the manner that he

8    said she did.  So what he does afterwards, if he's calling for

9    backup and explaining what happened, that is relevant as to

03:54:41    10    what happened during this exchange.

11    MS. EKL:  He doesn't explain what's happening, which

12    we would argue is hearsay anyway.  He just calls in and says --

13    he asks for backup, and that's it.  He calls and asks for

14    backup.  So it's after the point of the arrest.  I mean,

03:54:59    15    whatever she did that constituted probable cause for arresting

16    her had to have occurred before the resisting arrest.  He's in

17    the course of arresting her after all of that probable cause

18    already took place.  This radio call does not come until after

19    they've already had the struggle and he's trying to place her

03:55:18    20    under arrest.

21    Now as it relates to the fact that she's resisting,

22    they're arguing whether or not she was acting in a certain

23    manner at the time of the resisting.  It's our understanding

24    we're not really allowed to contest the fact that she's

03:55:29    25    resisting, so they shouldn't be able to show this at that point

1    in time.

2          Now, even if she was screaming like a wild person in

3    the background, it's not relevant to what happened at the point

4    before he grabbed her and was there probable cause at that

03:55:42    5    point and was he properly arresting her.  This isn't going to

6    prove that.  It's just going to confuse the jury, and it's

7    going to be extraordinarily prejudicial.

8          THE COURT:  All right.  Well --

9          MR. WEILER:  But while --

03:55:54    10          THE COURT:  Go ahead.

11          MR. WEILER:  Sorry.  While resisting is one charge,

12    her actions in resisting him, striking him as Officer Coltri

13    said, kicking him, that is part of the battery as well.  It's

14    not just a chest bump.  It's all of the physical contact by

03:56:16    15    Officer Coltri against -- by Ms. Noel against Officer Coltri.

16    So you can't just limit it to the chest bump.  The battery took

17    place over the course of the arrest.  So it's not -- yes, she

18    did resist, but the battery was not just the chest bump.  It's

19    the chest bump and her kicking him and hitting him during the

03:56:39    20    resisting as well.

21          MS. EKL:  His misdemeanor complaint included in the

22    exhibits does not include anything other than the chest bump.

23          THE COURT:  Well, let's see.

24          MS. EKL:  Later on, the state's attorney adds --

03:56:54    25          THE COURT:  So it says that she committed battery, and

1   I'm looking at Defendant's 7.  She pushed Officer Coltri in the

2   chest and struck him with her hands and feet about the leg and

3   upper body, knowing that the officer was an agent of the local

4   government while he was engaged in the performance of his

5   duties.

6           MS. EKL:  That's the information that was prepared by

7   the state's attorney and signed to on the next page.  If you

8   look at Plaintiff's Exhibit No. 1, which is the complaints that

9   were prepared by Coltri immediately after this event, it says:

10          "Crista Noel knowingly and without legal justification

11  battered Officer Coltri, a uniformed police officer for the

12  Westchester Police Department" --

13          THE COURT:  I don't have No. 1.

14          MS. EKL:  Oh, I'm sorry.

15          THE COURT:  Okay.

16          MS. EKL:  Then it says:

17          "In that she briskly walked up to Officer Coltri in a

18  provoking manner with her arms out to the side and chest bumped

19  him after being told to stop where she was."

20          THE COURT:  All right.

21          MR. WEILER:  Then it was amended by the state's

22  attorney after the preliminary hearing or at the preliminary

23  hearing.

24          THE COURT:  And it added in the hitting and kicking.

25          MR. WEILER:  It added that in, and that's what she was

03:57:16

03:57:32

03:57:42

03:58:06

03:58:20

1  prosecuted for under 12-4(b)18(c), which includes all of that.

2      THE COURT:  Yes.

3      MR. WEILER:  He was battered, knowing he was a police

4  officer.

03:58:40

5      THE COURT:  So that's what she was charged with.  I

6  mean, that's the complaint that he swore out, but what she was

7  ultimately charged with and prosecuted on is the information,

8  the facts in the information.

9      MS. EKL:  But, nonetheless, it doesn't change that

03:58:59

10 whatever statements are made after that is complete and he's

11 calling for backup is extraordinarily prejudicial.  Again, it's

12 a millisecond of time, and you hear something in the background

13 that's subject to interpretation.

14     THE COURT:  Well, I'll listen to it and rule on it at

03:59:17

15 trial as to whether it comes in or not.

16     All right.  Then the jury instructions.

17     MR. WEILER:  Well, I'm sorry.  There were some other

18 exhibits.  I wasn't sure how we were going to do this and what

19 the rulings on the motions in limine were going to be, so we

03:59:49

20 didn't include them.  There were some additional exhibits, and

21 I still don't know how many of these would or may be relevant

22 ultimately.  So there was this, this, and then this was already

23 included, and then this and this and this (indicating).

24     THE COURT:  All right.  So the first one that you

04:00:49

25 handed me is what?

1      MR. WEILER:  So this was -- it says "letterhead" up on

2   top in handwriting, and this was a document that was in

3   Dr. Greider's records when we subpoenaed them.

4      THE COURT:  Okay.

04:01:12  5      MR. WEILER:  The next one is an actual copy of what we

6   got from the subpoena in the subpoenaed records, which I used

7   at Ms. Noel's deposition, and she testified that she knew

8   nothing about this.  She didn't draft it.  She swore up and

9   down that she knew nothing about this.

04:01:36  10      We actually had to bring that up with Judge Zagel

11   later in the second part of her deposition which came after

12   Dr. Greider's deposition.  She clarified that she did, in fact,

13   write the handwritten comments that were written in, I think,

14   blue highlighter on this exhibit.  Where it says "letterhead"

04:02:06  15   and "leg" and "January 2009" and "example," that's in her

16   writing.

17      She still claimed that she didn't know who actually

18   drafted this letter, but Dr. Greider testified that she did not

19   draft it.  It's made to look like that it was something that

04:02:27  20   Dr. Greider drafted, and Dr. Greider disavowed it at her

21   deposition and said she did not write this.  She believed that

22   it could only have come from Ms. Noel or someone acting for

23   her.  She didn't know exactly how it came to be, but she wrote

24   the "X" on the part that says "my diagnosis," and that's her

04:02:57  25   handwriting where it says "ecchymosis" and "thighs," I think it

1    is.

2           So again, I don't know how relevant this is going to

3    be given Your Honor's rulings, but I think it's evidence, at

4    least in my view, of Ms. Noel or somebody on her behalf trying

04:03:17    5    to shape Dr. Greider's diagnosis, and so I think it's relevant

6    for that purpose.  Dr. Rone comments on it.

7           THE COURT:  Well, what's Dr. Greider going to testify

8    to?

9           MS. EKL:  Dr. Greider is not going to be testifying to

04:03:40    10    any of the things that are in here or even close to this

11    because she's been barred from testifying about causation in

12    relation to physical injuries.  So this is collateral

13    impeachment.  It has nothing to do with the issues that are now

14    in the case.  It's just going to be used to dirty up Ms. Noel

04:03:57    15    to show or to try to show that she's somehow trying to

16    influence the doctor.

17           So I expect that if this were to come in at trial

18    there would be a big explanation.  It would be a whole sideshow

19    into something that has nothing to do with the issues in the

04:04:10    20    case.  So it's certainly prejudicial.  There's not even a

21    proper foundation for it, and it shouldn't come in.

22           THE COURT:  Right.  But what is she going to testify

23    to, Dr. Greider?

24           MS. EKL:  Dr. Greider is going to talk about the

04:04:26    25    plaintiff's psychological injuries and that Ms. Noel went and

1   saw her after this event, and she's going to talk about her

2   diagnosis as a result of having gone through being charged.  It

3   will be the whole events, and we're going to have to try to

4   parse it out to the extent that we can.

04:04:45   5   It actually has nothing to do with this, and it will

6   open a whole can of worms to start getting into whether or not

7   Ms. Noel tried to influence her to give a diagnosis in relation

8   to physical injuries, which we completely disagree.

9   THE COURT:  All right.  Well, let me see how she

04:05:12   10   testifies, and then I'll let you know if you can use this.

11   All right.  Next?

12   MR. WEILER:  Next would be -- so I don't know if the

13   December 4th letter was included.  That was already included as

14   one of our exhibits, I thought, or was it?

04:05:38   15   MR. MASTERS:  From AT&T?

16   MR. WEILER:  Yeah.

17   MR. MASTERS:  I don't think so.

18   MR. WEILER:  Okay.  So we do we need this.  This is

19   the actual letter from AT&T on the layoff, the surplus letter.

04:05:54   20   THE COURT:  Okay.

21   MR. WEILER:  So again, if she's going to be allowed to

22   talk about not getting that position, then I think this is

23   relevant to show that she was, in fact, told as of December

24   4th:

04:06:17   25   "We have determined effective immediately we no longer

1    have a position for you."

2         Then it goes through the options of 60 days and

3    February 2nd, 2019, being the last day of that 60-day period,

4    which was, in fact, her last date of employment.

04:06:38    5         THE COURT:  But I think she's not going to testify

6    inconsistently with that, right?  She's going to testify that

7    she had received this letter and that her position with AT&T

8    was contingent on her getting a new position before the end

9    date.

04:06:59    10         MS. EKL:  Correct.

11         THE COURT:  Okay.

12         MS. EKL:  I mean, to use this substantively would be

13    no different than allowing us to use the Census Bureau letter

14    in showing why she doesn't have that.  They don't have anyone

04:07:13    15    coming in to lay a foundation for this or what's contained

16    within it.  So obviously the only relevance would be if she was

17    to testify inconsistently to try to impeach her as to what she

18    was told, but they'd still have to perfect it.

19         MR. WEILER:  Well, both Ms. Noel can lay the

04:07:32    20    foundation for it as can Ms. Pierce, who we designated by

21    deposition and testifies about this.  At the point we included

22    this, it wasn't clear what plaintiff's position was going to

23    be.  She's always contended that she lost her job at AT&T

24    because of her arrest and prosecution, and our position has

04:07:53    25    always been:  You were told a month before that your position

1  was ending and did, in fact, end on February 2nd, just as these

2  facts show.

3      If she's not going to testify differently than that,

4  then this may not be necessary.

04:08:13

5      THE COURT:  Okay.  I don't think it's going to be an

6  issue.  Go ahead.

7      MS. EKL:  There's a couple points.  One, I would

8  reserve any further argument because I haven't had a chance to

9  look at it but for a couple minutes before we got here.  Number

04:08:28

10  two, we are objecting to using the deposition transcript of

11  Ms. Pierce.  There's been no showing that she's unavailable or

12  any attempts to make her available, so we'd be objecting to

13  just reading in the transcript without the proper showing.

14      THE COURT:  Okay.

04:08:41

15      MR. WEILER:  I mean, she lives in Texas.  That's why

16  we took her deposition by video conference, so I think it's

17  proper to use it.

18      THE COURT:  Okay.  So the point is, because we've been

19  at this awhile, it's my understanding based on my ruling that

04:08:58

20  Ms. Noel will testify that she was working at AT&T, that at the

21  time of the incident she received a surplus letter and knew

22  from December 4th through February 2nd she was laid off and

23  needed to find a new position with AT&T, right?

24      THE PLAINTIFF:  It would be surplus.

04:09:33

25      THE COURT:  Surplus, yes, and you can -- well, you'll

1  have to explain to the jury what that means.  You know, you had

2  basically an end date, and the clock was running where you had

3  to find a new position with AT&T.

4         THE PLAINTIFF:  Yes.

04:09:54  5         THE COURT:  So unless Ms. Noel testifies differently

6  to that, then I don't see that this is relevant.

7         All right.  Then the next is the midyear review.

8         MR. WEILER:  There were a couple of documents that

9  relate to her exit package and her exiting employee

04:10:26  10  acknowledgment that have the date February 2nd, which shows

11  that's the date that she signed her exit package.

12         THE COURT:  Okay.  I don't think she's going to

13  testify differently to that.  You know, if by February 2nd she

14  had not obtained a position with AT&T, she at that point was

04:10:53  15  terminated.

16         MS. EKL:  Correct.

17         THE COURT:  Okay.  Then the other one, the review, the

18  performance review from 2008?

19         MR. WEILER:  Right.  Ms. Pierce testified about this

04:11:11  20  in her deposition.  The plaintiff was rated that she does not

21  meet the goals, and that was factored into which employees were

22  surplused.  They stack-ranked them, I think was her testimony,

23  and that evaluation was considered in ranking the employees and

24  determining who would be surplused.

04:11:42  25         So again, to the extent that there was any claim by

04:12:07

1   Ms. Noel that she was let go from AT&T and from her job at AT&T

2   because of anything having to do with the arrest, this would be

3   relevant to show that, number one, she was surplused and,

4   number two, she was not meeting the goals of the position at

5   the time, which explains why she was surplused.  It may well

6   explain why she was not -- if there is any evidence of any

7   interviews for other positions, why she wasn't accepted for any

8   positions at AT&T.

04:12:29

9       MS. EKL:  All this shows is why she was surplused, and

10  we're not going to -- if she was disputing the fact that she

11  was surplused, maybe that would be an issue.  This does not do

12  anything to prove or disprove why she didn't get another job

13  within AT&T.  It also is one of a number of documents, so we

14  would also reserve the right, if we needed to, to introduce

04:12:46

15  additional documents.  But I think we're getting off on a

16  collateral issue.  The question is --

17      THE COURT:  Well, I think that's why, you know, I'm

18  limiting any testimony with regard to AT&T, because of what

19  happened.  So because of the incident, it's my understanding

04:13:11

20  that Ms. Noel was not able to pursue any opportunities on her

21  end with AT&T.  If the testimony is limited to that, then what

22  AT&T knew or didn't know about the incident, what AT&T did, you

23  know, as a result of the incident is not relevant and is total

24  speculation.

04:13:42

25      MR. WEILER:  So there won't be any testimony that:  I

1   didn't get a job that I was planning on interviewing for

2   because I was arrested.

3           There's no evidence from AT&T's part that, number one,

4   there was an interview or why she was or she was not.

04:14:01   5   THE COURT:  That's what I just said.

6           MR. WEILER:  As long as that's clear and there's no

7   inference that --

8           THE COURT:  It's, you know:  I didn't have it in me to

9   pursue these opportunities because I was so distraught about

04:14:19   10   what happened.

11          MS. EKL:  Understood.

12          THE COURT:  All right.  Anything else?

13          MR. WEILER:  I think we included the sentencing order.

14          MS. EKL:  And we would object to that.

04:14:30   15   THE COURT:  I don't have it.

16          MR. WEILER:  Oh, sorry.

17          MS. EKL:  This is a sentencing order obviously on her

18   resisting arrest.  So again, the issue is --

19          MR. WEILER:  I agree.  It would only be relevant if

04:14:48   20   for some reason the jury needs to hear about the resisting

21   arrest conviction.

22          THE COURT:  But they don't.

23          MS. EKL:  We're not -- I mean, I think that they need

24   to hear that she was convicted, or they may need to hear it.

04:15:00   25   MR. WEILER:  Right.

1    MS. EKL:  But it's part of --

2    THE COURT:  Right, they'll hear that she was

3    convicted.  They don't need to hear what the sentence was, that

4    she received a conditional discharge or any of this.  I don't

04:15:20    5    see that that's relevant.

6    MR. WEILER:  Then we can withdraw that.  I mean, the

7    only other thing it would be used for would be to refresh

8    recollection, but other than that, I agree.

9    MS. EKL:  Well, the only other issue that's actually

04:15:31    10    related to the resisting, in the jury instructions we had

11    objected to their introduction of the definitions instruction

12    related to the resisting arrest, and we would be withdrawing

13    that.

14    THE COURT:  Okay.

04:15:42    15    MS. EKL:  We believe that that would be necessary.

16    THE COURT:  All right.  So with the jury instructions,

17    I'll go over and through the plaintiff's proposed instructions.

18    All right.  So Instruction No. 1 is agreed, and I will give

19    that.  No. 2 is agreed.  Instruction No. 3, I don't know that

04:16:37    20    I'm taking judicial notice of anything, any exhibits.  Am I?

21    MR. WEILER:  I don't know yet.

22    MS. EKL:  I don't know yet.

23    THE COURT:  All right.  Well, if I take judicial

24    notice, we'll add it in.  If I don't, I'll just give it as

04:16:55    25    proposed.  No. 4?

1  MR. WEILER:  Are we looking at Plaintiff's Proposed 3?

2  THE COURT:  No, I'm on 4.

3  (Discussion off the record.)

4  MR. WEILER:  I'm sorry.

04:17:20

5  THE COURT:  All right.  No. 4, I generally give the

6  full paragraph.  Sometimes, you know, it's -- generally, these

7  cases don't get any press coverage, but every now and then if

8  things are really slow there might be something.  So I just put

9  that in there.  I don't think it's going to confuse the jury.

04:17:50

10  By the time they're getting their jury instructions, they know

11  that they are not to look at anything or to consider anything

12  outside of the courtroom.

13  I will give No. 5, No. 6, No. 7, No. 8, No. 9, No. 10,

14  No. 11, No. 12, No. 13, No. 14, No. 15, No. 16.  Then No. 17,

04:19:00

15  I'm looking for defendant's.

16  MS. EKL:  I think it's page 58 of 70 at the top.

17  THE COURT:  Thanks.  All right.

18  MR. WEILER:  So this comes from the IPI instruction.

19  THE COURT:  Right.  So you're objecting to the last --

04:20:06

20  to the fact that there isn't a last sentence.

21  MR. WEILER:  Right.

22  THE COURT:  The fact that she was later acquitted

23  doesn't mean that there was no probable cause at the time of

24  the arrest.

04:20:15

25  MR. WEILER:  Correct.

1    THE COURT:  All right.

2    MS. EKL:  This is the IPI, Illinois Pattern Jury

3    Instructions.  Wait.  Oh, I believe this is an instruction

4    related to probable cause but not in the context of malicious

04:20:42    5    prosecution, so that was our objection, Illinois Pattern Jury

6    Instruction 7.08.

7    (Brief pause.)

8    THE COURT:  All right.  So I thought I had the IPI's

9    here, but I don't.  So I'll rule on 17.  I'm going to follow

04:21:17    10   the IPI.  Generally, I do substitute the party names throughout

11   the instructions.  It's just easier for the jury to follow

12   along.

13   MS. EKL:  Right.

14   THE COURT:  All right.  18 looks like it is agreed in

04:21:58    15   that you substituted in "aggravated battery" as opposed to

16   "criminal proceeding."  So I'll give that.  19 I think is

17   duplicative of 17, so I'm going to refuse that as duplicative.

18   Then 20 is Defendant's 19.

19   MR. WEILER:  Right.

04:24:31    20   THE COURT:  So it looks like in 20, Plaintiff's 20,

21   defendants want the word "only" added to the last sentence.

22   MR. WEILER:  There's two spots.

23   THE COURT:  Yes, I was getting there.

24   MR. WEILER:  Sorry.

04:24:52    25   THE COURT:  It says that malice may be inferred from

1  the absence of probable cause only if the circumstances are

2  inconsistent with good faith and only if the absence of

3  probable cause has been clearly proved.  I'm not sure why

4  plaintiff believes that this is increasing her burden.

04:25:33

5  MS. EKL:  Just to throw in the word "only" in two

6  circumstances limits how we can prove malice, and I don't think

7  it's an accurate statement of the law.

8  THE COURT:  No, it doesn't.  It's not limiting how you

9  can prove malice.  It's limiting how you can use the absence of

04:25:55

10  probable cause.  Just grammatically, I would not put "only" in

11  twice; I'd put it in once.  2016 says that malice may be

12  inferred from a lack of probable cause only where there is no

13  evidence that refutes that inference.

14  MR. WEILER:  And that's why we included it.

04:27:12

15  MS. EKL:  And I think the fact that the plaintiff --

16  I'm sorry -- that the defendant has been able to find one case

17  from the Second District where they've included the word "only"

18  doesn't necessarily mean that it should be included in the law

19  pertaining to the facts in our case.

04:27:34

20  MR. WEILER:  Well, it's used in the Gauger case, and

21  it's cited by Bianchi.

22  THE COURT:  All right.  Well, I will go back and

23  reread Gauger and Bianchi, and I'll provide you with a

24  definition of "malice."

04:28:02

25  All right.  We'll give 21.  You're withdrawing 22.

1       For the class-of-one claim, what's plaintiff's
2  objection to "conceivable rational basis" as opposed to what
3  you have, "without any rational basis"?

4       MS. EKL:  We think that it improperly increases the
04:29:40  5  burden on the plaintiff.  I think there's a split in the
6  authority, and we would ask this Court to follow the proposed
7  instruction in light of Judge Easterbrook's and Judge Posner's
8  and Judge Wood's opinion in the Del Marcelle case.

9       THE COURT:  Well, defendants are citing the Del
04:30:09  10  Marcelle case, right?

11       MR. WEILER:  Right.

12       THE COURT:  In the Del Marcelle case, the Seventh
13  Circuit uses the phrase "conceivable rational basis" at least
14  twice.

04:30:25  15       MR. WEILER:  Right, and that's why we feel that it's
16  more appropriate.

17       THE COURT:  So it explains to the jury that the
18  descriptor of "conceivable" means that if they can think of a
19  rational basis for arresting and prosecuting Ms. Noel for
04:31:16  20  aggravated battery, then they need to find for Officer Coltri.
21  So it's instructing them as they're going through this, you
22  know, if they can think of a rational basis, then there is no
23  class-of-one claim.

24       MR. WEILER:  I mean, it's also cited by Miller versus
04:31:55  25  Monoma in 2015.  I think it's consistent in all of the cases

1  that these class-of-one claims, especially in this context,

2  they're not supposed to be a duplication of malicious

3  prosecution.  They're not easy claims to prove, and the court

4  has set a bar as it did by referencing any "conceivable

04:32:22  5  rational basis."

6  MS. EKL:  The court hasn't set that bar.  Brunson

7  versus Murray, which is Seventh Circuit 2016 case, follows the

8  law that we've cited.  In Brunson, the Seventh Circuit states

9  on page 706 -- well, first it lays out the three different

04:34:53  10  opinions in the en banc Del Marcelle case.  It says that there

11  are three different standards, and then it goes on to state:

12  "Class-of-one claims must simply address whether a

13  rational basis can be conceived" -- in italics -- "not whether

14  one is established on the record or occurred to a defendant.

04:35:24  15  Under that standard, the only proper use of intent in a

16  class-of-one case is to show that discrimination exists."

17  Then it goes on to say:

18  "Accordingly, Brunson has shown a lack of rational

19  basis so that his claim survives summary judgment under Judge

04:37:02  20  Easterbrook's standard in Del Marcelle.  Still, something other

21  than the normal rational basis test applies to a class-of-one

22  claim, even if that something has not been clearly delineated.

23  Brunson will need to address intent on remand."

24  So given the language in Brunson and in Judge

04:37:51  25  Easterbrook's opinion in Del Marcelle, I'm going to add

1  "conceivable" to "rational basis."

2          MR. WEILER:  We have that in our Instruction No. 20.

3  Plaintiffs also leaves out if you find Noel proves these

4  things.  Our says if you find that Noel has proved both of

04:38:28  5  these things by a preponderance.  So I think it's clearly

6  stated.

7          THE COURT:  Yes, we'll add that.

8          MR. WEILER:  So you're going to modify Plaintiff's 23.

9          THE COURT:  Right.  Okay.  No. 24, I don't know that

04:39:42  10  we need Plaintiff's 24 because Plaintiff's 24 is collapsing the

11  two elements and I do think that that would be confusing to the

12  jury.  I don't know that you need to -- that the jury needs a

13  separate instruction on what to consider when they're

14  determining whether a rational basis exists for the

04:40:44  15  prosecution, so I'm going to refuse 24.

16          For Plaintiff's 25, I would modify that to be more

17  clear.  So the first paragraph, the last part of it will read

18  "as a direct result of the defendant's arrest and prosecution

19  of Ms. Noel for aggravated battery," and that will more clearly

04:42:41  20  direct the jury as to what they are considering in terms of

21  damages.

22          MR. WEILER:  My only comment there would be the

23  inclusion of the word "arrest and prosecution."

24          THE COURT:  Oh, it's a malicious prosecution.

04:43:11  25          MR. WEILER:  It's prior to the arrest.

1      THE COURT:  Yes, yes, yes, you're right.  So we'll

2  take out the "arrest" and say "defendant's prosecution."

3      MS. EKL:  Actually, shouldn't it say "charge and

4  prosecution"?

04:43:54    5      THE COURT:  Yes, because it's -- yes, I guess it would

6  be "charge and prosecution" because it's commencing a

7  proceeding and that commenced with the charge.  So then

8  Plaintiff's Proposed 23, I guess it should be for number 1 that

9  Coltri "charged and prosecuted."

04:45:37    10      So you don't have physical -- in paragraph 2, because

11  she can't recover for any physical injuries --

12      MS. EKL:  I'm sorry, Judge.  You're looking at 23

13  again?

14      THE COURT:  I'm looking at 25, paragraph 2.  She's not

04:46:05    15  recovering and I'm not allowing her to recover for any physical

16  injuries.

17      MS. EKL:  Oh, I see.  I'm sorry.  We forgot to exclude

18  that.  We excluded it in (a).

19      THE COURT:  It should be that they include the mental

04:46:32    20  aspects of injury, even if they are not easy to measure.

21      Then with the attorney's fees, is she going to be able

22  to say what the attorney's fees were?

23      MS. EKL:  I'm not sure yet.  So we will only put that

24  in if we can.

04:46:55    25      THE COURT:  Right.  Okay.  I'm going to bracket that

1  because she can only get the fees on the aggravated battery,

2  not the resisting arrest.

3          MS. EKL:  Okay.

4          THE COURT:  All right.  I will make a decision on

04:47:12  5  whether punitive damages is appropriate.  So I'll let you know

6  on that.  At this point, plaintiff wants the punitive damages

7  instruction?

8          MS. EKL:  Yes.

9          THE COURT:  All right.  Then I'll give 27 and 28 and

04:47:38  10  29.

11          MR. WEILER:  What did we do with 26?

12          THE COURT:  26 is the punitive damages, and I will

13  decide.

14          MR. WEILER:  Oh, that's punitive damages, okay.

04:47:54  15          THE COURT:  Then any objection to the verdict form?

16          MR. WEILER:  Yes.  We had our own verdict form that we

17  believed was more appropriate.  You gave 27, 28, and 29?

18          THE COURT:  Yes.

19          MR. WEILER:  Okay.  We had a separate verdict form.

04:48:27  20          THE COURT:  I see that.  I don't think we need to

21  go -- I don't know that we need to break out the verdict form

22  on all of the elements.  Why do you think that we need to break

23  these down as to the various elements?  I'm not breaking down

24  the malicious prosecution as to the elements.

04:49:25  25          MR. WEILER:  It was actually a verdict form that we

1   found in a case in Wisconsin.  I think it was given by a

2   district court, and it seemed to apply to malicious

3   prosecution.

4           THE COURT:  You know --

04:49:41  5           MR. WEILER:  There really --

6           THE COURT:  -- I'm instructing them as to what the

7   elements are and what they have to find on both for the equal

8   protection and class-of-one claim.  You know, if you're going

9   to do it that way, then you would need to break it out, break

04:50:03  10  out the malicious prosecution to make them equivalent.  I think

11  that in some ways if you're breaking this down to the elements,

12  if you're only breaking one of the claims down to the elements,

13  I think it highlights one claim over the other.

14          MS. EKL:  I also think it's improperly instructing the

04:50:26  15  jury as to how to deliberate.  Where they have to find two

16  elements, you're basically instructing them to find one before

17  the other, and you're telling them how to deliberate on the

18  issues.

19          MR. WEILER:  Well, I mean, that is the law.  If they

04:50:45  20  find any conceivable rational basis, then they don't go to the

21  next step and they don't find in favor of plaintiff.

22          THE COURT:  Yes, I agree.  I don't know that that's my

23  problem with it.  I don't know that it --

24          MR. WEILER:  It's not symmetrical.

04:51:08  25          THE COURT:  Yes, it's not symmetrical with malicious

1   prosecution.  I think it highlights the federal claim over the

2   state claim, and I think I've sufficiently instructed the jury

3   earlier that there are two elements and they need to find both.

4   For most cases, you know, the verdict form is not -- in most

04:51:36   5   cases, in the verdict form you're not asking the separate

6   questions based on the elements.  You're basically asking the

7   jury how they find as to each of the claims.

8           MR. WEILER:  Okay.  The other issue with it, not that

9   I want to include it, but there's no line for damages.

04:52:00   10           THE COURT:  Right, we need to add a line for damages.

11           MS. EKL:  We need to add that.

12           THE COURT:  Yes.

13           MS. EKL:  No objection.

14           MR. WEILER:  Or lines for signatures.

04:52:12   15           MS. EKL:  I think it was getting late.

16           THE COURT:  So I would put at the bottom, you know:

17           "If you find for plaintiff Noel on either or both

18   claims, insert an amount for damages."

19           MS. EKL:  Okay.

04:52:59   20           THE COURT:  Then I'd have a line.

21           MR. WEILER:  Ours indicates the element of emotional

22   distress, which is the only element that she can recover on.

23           MS. EKL:  We would object to that.  I disagree.

24           THE COURT:  I mean, she could recover for -- I mean,

04:53:23   25   there are various aspects of damages, you know, compensatory

1  damages.

2      MR. WEILER:  In the damages instruction, I think

3  that's the only one.

4      THE COURT:  Right.  It says pain and suffering, but

5  then they've also included attorney's fees.

04:53:53

6      MR. WEILER:  Which I don't know if there is any way to

7  segregate if she was represented on both the resisting and

8  aggravated battery.  There was one trial, and she was found

9  guilty on resisting.  There's no way to say that, you know,

10  there was any more attorney's fees charged or incurred because

04:54:19

11  of the agg. bat. versus the resisting.

12      MS. EKL:  Certainly there would if an attorney charges

13  a flat fee and charges X amount for a felony regardless of how

14  many misdemeanors and he would charge a different amount for a

15  misdemeanor.

04:54:36

16      THE COURT:  Well, we don't know.  So unless there's --

17  you know, you'll need to get something from the attorney that

18  represented her showing what the breakdown would have been.

19      MS. EKL:  Okay.

20      THE COURT:  What it was.

04:54:48

21      MR. WEILER:  Well, at this stage, I mean, there hasn't

22  been anything produced in this respect.

23      THE COURT:  Right.

24      MR. WEILER:  It's unfair to say if they get something

25  from the attorney now.

04:54:58

1    THE COURT:  Well, we'll have to run over that bridge
2    when we get to it, you know.

3    MR. WEILER:  Okay.

4    THE COURT:  Right now, you've got nothing.

04:55:08  5    MS. EKL:  I understand.

6    THE COURT:  So we'll get there.

7    All right.  Then I don't know that I need an
8    instruction on the summary of the claims.

9    MR. WEILER:  You're on defendant's instructions?

04:55:31  10    THE COURT:  I'm on defendant's instructions.

11    MR. WEILER:  Okay.

12    THE COURT:  I don't know that I need an instruction on
13    that because we're going to get to the elements in the two
14    claims.

04:55:55  15    All right.  I think the only one that's different at
16    this point between the two is Defendant's Instruction 16.  So I
17    will give Defendant's 16 because that's generally given as a
18    pattern.  I mean, the village is a nominal party, right?

19    MR. WEILER:  It's not a party at all, not even for
04:57:49  20    indemnification.

21    THE COURT:  It's not?

22    MR. WEILER:  I mean, you know, if they recover, they
23    can ask that Westchester indemnify him.  There's a statute that
24    says that they're required to, but they are not a party at this
04:58:03  25    point.  They were a party earlier, I believe, and they were

1   dismissed.

2           MS. EKL:  They were dismissed on the policy.

3           THE COURT:  Yes.

4           MR. WEILER:  Yeah, they're not a party, you know, for

04:58:22  5   any purpose at this point, and they haven't been.

6           MS. EKL:  Well, we'd object to this instruction.

7           THE COURT:  I mean, what's the point of this

8   instruction?

9           MR. WEILER:  I mean, to make it clear that Coltri is

04:58:35  10   the only defendant and that they shouldn't assume that the

11   village is.

12           MS. EKL:  Well, the point is to try and make it look

13   like Coltri is going to have to pay for the judgment, and

14   that's not accurate.

04:58:48  15           THE COURT:  So here's the thing.  If I give the

16   punitive damages instruction, because they won't cover

17   punitives --

18           MR. WEILER:  Right.

19           THE COURT:  -- if I give the punitive damages

04:59:01  20   instruction, I'll give this instruction.  If I don't give the

21   punitive damages instruction, then I won't give this

22   instruction.  All right?

23           MR. WEILER:  Okay.

24           THE COURT:  All right.  Then the only other one that I

04:59:29  25   haven't covered is 21.

1    MR. WEILER:  Right.

2    THE COURT:  Why does defendant believe I need to give

3  this instruction?

4    MR. WEILER:  Because it clarifies what "rational

05:00:29   5  basis" means under the law, and it's necessary for the jury to

6  understand the plaintiff's burden in a class-of-one case.

7    THE COURT:  Well, I think the instruction that we've

8  kind of knocked out already, which is 23 --

9    MR. WEILER:  The second paragraph also defines what

05:01:10  10  deference Coltri is to be given as a police officer, and that

11  comes from --

12    THE COURT:  Where does that come from?

13    MR. WEILER:  That comes from -- I think that's the one

14  that comes from the DB case.

05:01:33  15    MS. EKL:  I think this is inconsistent with the law.

16  In the other instructions, it instructs the jury that a police

17  officer is to be given the same -- I have to find it in here.

18    THE COURT:  Well, that's the credibility issue.

19    MS. EKL:  Right.

05:01:50  20    THE COURT:  But that's different than giving deference

21  with regard to charging decisions --

22    MR. WEILER:  Decisions.

23    THE COURT:  -- and prosecution decisions.  All right.

24  I'm going to defer ruling on this one and go back and look at

05:02:13  25  the DB case.  The reason I'm doing that is because the

1    deference issue is not included in Plaintiff's Proposed 23.  So

2    I will go back and look at that.

3              All right.  I'm dealing with 22 now.

4              MR. WEILER:  This is the one that relates to the IPI,

05:02:57  5    and you were going to look at it.

6              THE COURT:  Right, I'm going to go back and look at

7    the IPI.

8              MS. EKL:  I would just point out that this is talking

9    about probable cause at the time of arrest, and that's

05:03:08  10    different from probable cause in the context of malicious

11    prosecution.  So that would be our objection.  It doesn't

12    actually state probable cause in this context.  This is the IPI

13    for false arrest, so it's different.

14              THE COURT:  Okay.  Then any objection to 23, which is

05:03:27  15    the aggravated battery?

16              MS. EKL:  No.

17              THE COURT:  All right.  Then any objection to 25?  I

18    don't know why we need this, because there won't be any

19    argument or evidence with regard to excessive force.

05:04:01  20              MR. WEILER:  Yeah, as long as that's true, I agree.

21              THE COURT:  Okay.

22              MS. EKL:  And we withdraw our objection to 26.

23              THE COURT:  Okay.

24              MS. EKL:  We agree that that should come in.

05:04:17  25              THE COURT:  All right.  So then I think -- well, for

1    27, are you objecting to the last sentence or the second

2    sentence?

3              MS. EKL:  I'm sorry.

4              MR. WEILER:  Which one are we on?  I'm getting

05:04:43  5    confused.  Are we on 26?

6              THE COURT:  We're on 27.

7              MR. WEILER:  26 is --

8              THE COURT:  On 26, they withdrew their objection, and

9    so that's given.

05:04:55  10             MR. WEILER:  Oh, that's given, okay.

11             THE COURT:  27, are you objecting to the last sentence

12   or the second sentence?

13             MS. EKL:  I'm sorry.  It's the last sentence.  You

14   know, it says any statements to the contrary by Noel or any

05:05:07  15   other witness must be ignored, and I think that that is overly

16   broad and confusing and would cause the jury to --

17             THE COURT:  Well, Ms. Noel is not going to testify

18   that she wasn't found guilty of resisting arrest, right?

19             MS. EKL:  Correct.  It's just the "any statements"

05:05:28  20   portion is contrary.  I think that we can stipulate she was

21   found guilty of resisting arrest.  I mean, she's certainly not

22   going to say otherwise.

23             THE COURT:  All right.

24             MR. WEILER:  I don't have a problem with removing that

05:05:42  25   last sentence as long as, you know, nobody testifies to the

1    contrary.

2             THE COURT:  Okay.

3             MR. WEILER:  If they do, we think it would be

4    appropriate.

05:05:50    5             THE COURT:  I'll bracket it for now, and we'll remove

6    it if anybody testifies to the contrary.

7             Then that's it, I think?

8             MS. EKL:  Yes.

9             THE COURT:  All right.  So then we are starting on the

05:06:29   10    10th and if you're here by 8:30 so that we can just make sure

11    that there are no issues.  If you want to come in this Friday

12    and use the ELMO, make sure you know how to use the ELMO and

13    the others, we've got an electronic evidence system basically

14    where you hook up to the cart, the evidence cart, and it shows

05:07:02   15    in the jury box.

16             MR. WEILER:  Is there somebody that we should contact

17    for that?

18             THE COURT:  Alex Zeier, Z-e-i-e-r.

19             MR. WEILER:  Z-e-i-e-r?

05:07:14   20             THE COURT:  Yes, and he can let you in on Friday.

21             MR. WEILER:  Okay.  Is he the IT person?

22             THE COURT:  He's the IT guy.  So if you just go on the

23    website, there's a number for him on the website.

24             MR. WEILER:  There's a number for him?  Okay.

05:07:27   25             THE COURT:  Then if you can also just give me a

1  binder, you can just do one with the combined exhibits and with

2  a table of contents at the front with tabs.  If you do two, one

3  for me and one for Adam, okay?

4          MR. WEILER:  Two binders, okay.

5          THE COURT:  And so I think that takes care of

6  everything.

7          MS. EKL:  The only thing, because we're so close to

8  trial, it might otherwise be premature to raise, but I just

9  wanted to bring to your attention there's a possibility that

10  one of the key witnesses, Pamela Tolbert, may be unavailable

11  and out of the state.  I don't know exactly the circumstances.

12  We're trying to flesh those out.  It's my understanding that

13  she has a new job and that she has a conference, but I haven't

14  been able to confirm that it's during the week of the trial.

15  So I just wanted to let everyone know that now since we're

16  getting close, even though I don't know the specifics of it.

17          THE COURT:  All right.  Well, if it turns out she's

18  unavailable, then you can figure out how you want to bring in

19  her testimony.  Was she deposed?

20          MS. EKL:  She was deposed, but she was deposed by my

21  client.  So if that is the case, we would be seeking a

22  continuance, unfortunately.  Even though my client is anxious

23  to get this over with, she's key.  She's the only other witness

24  that's not a law enforcement witness who was on the scene.

25          THE COURT:  Okay.

05:08:12

05:08:23

05:08:44

05:09:01

05:09:16

1    MS. EKL:  She was deposed, but it was when she was pro

2    se.  So there are limitations as to what can come in.

3            MR. WEILER:  We took her deposition.

4            MS. EKL:  Well, they got what they need, but we would

05:09:34    5    be limited in probably being able to -- well, I'm putting the

6    cart before the horse, but I just wanted to preview that.  I

7    guess I need to find out some more information.

8            THE COURT:  Okay.  So you need to let us know sooner

9    rather than later because, otherwise, this case is not going to

05:09:53    10   trial for months, like probably 2020 --

11           MS. EKL:  Okay.

12           THE COURT:  -- because we are completely backed up in

13   the fall.

14           MS. EKL:  Okay.

05:10:04    15   THE COURT:  So you need to let us know sooner rather

16   than later.

17           MS. EKL:  Will do.

18           THE COURT:  Okay.  Anything else?

19           MR. WEILER:  I think that's it.  Famous last words.

05:10:21    20   THE COURT:  All right.  I will see everybody here on

21   the 10th.

22           MR. WEILER:  Thank you.

23           MS. EKL:  Thank you, Judge.

24           THE COURT:  You're welcome.

05:10:28    25       (Proceedings concluded.)

1     C E R T I F I C A T E

2          I, Patrick J. Mullen, do hereby certify that the

3     foregoing is a complete, true, and accurate transcript of the

4     proceedings had in the above-entitled case before the Honorable

5     SARA L. ELLIS, one of the judges of said Court, at Chicago,

6     Illinois, on May 29, 2019.

7

8                              */s/ Patrick J. Mullen*
                               Official Court Reporter
9                              United States District Court
                               Northern District of Illinois
10                             Eastern Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25