IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM VIRAMONTES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-cv-6251 |
| | ) | |
| CITY OF CHICAGO and CHICAGO | ) | Judge Kendall |
| POLICE OFFICERS JESSICA BRADY, | ) | |
| Star # 12552, and MARC LAPADULA, | ) | |
| Star #6785, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION FOR A NEW TRIAL**

Plaintiff WILLIAM VIRAMONTES, by and through undersigned counsel, respectfully moves this Court, pursuant to Fed. R. Civ. P. 59, to grant his motion for a new trial. In support thereof, Plaintiff states as follows:

Plaintiff sued two Chicago Police Officers for violating his constitutional rights. He alleged that 1) they used excessive force against him; and 2) maliciously prosecuted him for mob action. After a two day trial, the defendant-officers were found not liable. Pursuant to Fed. R. Civ. P. 59, "The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Plaintiff should be granted a new trial because of the various procedural rulings this Court made in the days leading up to and during his trial, as well as because of argument and conduct of defense counsel. To establish a right to a new trial, Plaintiff must show: 1) multiple errors occurred at trial, and 2) those errors were so severe they rendered the trial fundamentally unfair. See United States v. Powell, 652 F.3d 702, 706 (7thCir.

1

2011)(citing Alvarez v. Boyd, 225 F.3d 820, 824 (7thCir. 2011)). The cumulative effects of the Court's rulings deprived Plaintiff of his right to a fair trial. Christmas v. City of Chicago, 682 F.3d 632, 643 (7thCir. 2012). Therefore, this Court should grant Plaintiff's motion for a new trial.

        A.        **<u>Improper Arguments by Counsel During Closing Arguments</u>.**

The defendants blatantly violated the Court's motion in limine by arguing that the defendants were "stars" during closing arguments. Dkt. 68, p. 2. The Court barred improper bolstering of the defendants' character through the use of accommodations and the like. See id. However, during closing argument, counsel argued exactly that. R. 372:1-6. Such an argument was clearly inappropriate, especially when foiled with defense counsel's brash and entirely inappropriate argument that Plaintiff's felony conviction meant he could conform his conduct to the requirements of the law.

Over Plaintiff's objection, the Court allowed into evidence Plaintiff's felony conviction pursuant to Fed. R. Evid. 609. See Dkt. 72, p. 3-4. The only purpose for this conviction was to show that Plaintiff could not be honest. See id; see also Fed. R. Evid. 609. However, the defendants intentionally misused this evidence in the worst possible way. "…the Viramontes brothers were there to incite violence and start street fights. That was their purpose that night, and that is why Mr. Viramontes was arrested. Now, you've heard evidence that Mr. Viramontes has been convicted of a felony crime in 2012. This reflection reflects – this conviction reflects on Mr. Viramontes' unwillingness to conform his conduct to the law." R. 351:9-16. Plaintiff is mindful that the Court suggested Plaintiff's counsel ought to have moved to strike the argument, but the bell cannot be unrung. Regardless, the defendants should not benefit from their counsel's intentional misconduct during the trial.

The Seventh Circuit addressed a similar issue while sitting *en banc* under F.R.E. 404(b) in United States of America v. Gomez, No. 12-1104 (7th Cir. 2014). In that case, the Seventh Circuit addressed the problem that, "other-act evidence is usually capable of being used for multiple purposes, one of which is propensity." Id. at 13 (citing United States v. Beasley, 809 F.2d 1273, 1279-80 (7th Cir. 1987)("Almost *any* bad act evidence simultaneously condemns by besmirching character and by showing one or more of 'motive, intent, . . ..") (emphasis in original)). The Court noted that, ". . . other-act evidence offered to prove a person's character and inviting an inference that he acted in conformity therewith – is *categorically* inadmissible." Gomez, at p. 13, fn. 3 (emphasis in original). Here, the defendants blatantly argued that evidence which was admitted solely for impeachment meant he was a bad person incapable of being law-abiding and, thus, must have been breaking the law on the night of this incident. See id.

At pretrial, the defendants asked the Court to accept their reasoning that Plaintiff's conviction years after his interaction with the defendants bore on his trustworthiness. However, the defendants' arguments to the jury proved that they admitted this evidence for an improper purpose. They waited for the most opportune moment to argue something that the Rules, this Court, and case law made perfectly clear is impermissible. See United States v. Thomas, 321 F.3d 627, 635 (7th Cir. 2003)(again recognizing "a jury is not likely to insist on the government's satisfying so demanding a standard of proof if the defendant is a thoroughly bad sort who even if not clearly guilty of the crime with which he is charged is no doubt guilty of some [other] crime" and district courts should "cautiously approach the weighting of probative value against the prejudicial effect of prior convictions"). They should not be allowed to get away with such calculated misconduct. Plaintiff's motion for a new trial should be granted as the cumulative effect of the defendants' argument resulted in an unfair trial for Plaintiff.

## B. Defendants' Improper Argument that Their Actions were Justified by CPD's Use of Force Model.

The defendants likewise argued that their use of force was consistent with the use of force model. Although the Court ruled that they would be allowed to testify regarding their training, they should not have been allowed to take the next leap and testify that their actions were reasonable because what they did was consistent with their training. See Thompson v. City of Chicago, 472 F. 3d 444, 455 (7th Cir. 2006)(holding that "if confronted with the question of whether police manuals, guidelines or general orders are "reliable gauges" of the reasonableness of an officer's use of force, the Court would reach the same conclusion that it did in *Whren*); see also Whren v. United States, 517 U.S. 806, 815-16 (1996)(concluding police rules, practices and regulations are an unreliable gauge by which to measure the objectivity and/or reasonableness of police conduct). In fact, defense counsel submitted to the Court that the Defendants would not do that, and then did it anyway. See Dkt. 68, p. 2. Not only did this argument invade on the province of the jury, it also violated the motion in limine. See id. This secondary argument based upon their training was a violation of the motion in limine regarding general orders because of how they used it. It was not just saying how they are trained. It was saying that by acting in conformity with their training, they could not have violated the Constitution. See R. 257:21-258:3; see also id. at 348:1-3 ("These officers encountered a violent man that night, and they dealt with that situation in a manner that was reasonable and in compliance with their training."). By flipping their own motion in limine on its head, Plaintiff was unduly prejudiced by this non sequitor of an argument. Just as violating a police department general order cannot establish a constitutional violation, potentially acting pursuant to one cannot disprove a constitutional violation. Unlike in Thompson, though, the admittance of this testimony was not harmless because the defendants alone were allowed to characterize what the general order stated

4

and how their actions were consistent with it—there was no adequate opportunity to cross examine he defendants on this. See Thompson, 472 F. 3d at 456; see also Ratliff v. City of Chicago, No. 10 C 739 (N.D.Ill. Nov. 19, 2012)(holding "the existence of the General Orders cannot be used in this case to show that the Plaintiff's constitutional rights were (or were not) violated"). In this regard, the defendants' argument was in contravention with the Court's ruling and confused the issues for the jury. Accordingly, the plaintiff should be granted a new trial.

### C. The Court's "Malice" Instruction was Confusing and Resulted in a Compromise Verdict.

Over Plaintiff's objection, the Court issued a malice instruction that was unnecessarily confusing and overstated Plaintiff's burden under the law to prove malicious prosecution. See Dkt. 82, p. 27. "Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." Jimenez v. City of Chicago, 830 F.Supp.2d 432, 451 (N.D.Ill. 2011)(citing Rodgers v. Peoples Gas, Light & Coke Co., 315 Ill.App.3d 340, 349, 248 Ill.Dec. 160, 733 N.E.2d 835, 842 (2000)). Furthermore, the Rodgers Court makes clear that "the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes that inference." Rodgers, 733 N.E.2d at 842. Accordingly, the Court's instruction that Plaintiff must have shown that the defendants initiated the criminal proceeding for the purpose of injuring him was a misstatement of the law. See Dkt. 82, p. 27. Furthermore, the Court's instruction favored the defendants by referring to them by their official office, as opposed to simply their role in this case: defendant. See id.

The jury's note only further supports Plaintiff's argument. Dkt. 89. The jury thought Plaintiff had to find the defendants guilty of something, which they did not, in order to find them liable. However, before any clarification was sent to the jury, they announced that they had

5

reached a verdict. R. 420:2-421:25. The sequence and substance of the communication from the jury is highly suggestive of the fact that the verdict was a result of compromise.

In similar circumstances, courts have found that a claim of deadlock followed by a verdict soon thereafter is evidence of a compromise verdict. See Mekdeci v. Merrell Nat. Laboratories, 711 F.2d 1510, 1515 (11th Cir. 1983). Here, too, evidence that the jury was confused by the law, followed by a quick reversal and finding, is evidence of a compromised verdict. See Skinner v. Total Petroleum, Inc., 859 F.2d 1439 (10th Cir.1988)("the jury's sudden arrival at unanimity, when just a few hours before it was still struggling with an apparently close issue of liability, raises the question of the reliability of the jury's verdict"). In Skinner, the Court found the jury's sudden arrival at unanimity a few *hours* after struggling with reaching agreement suspect. Id. This case presents an even stronger indicia of compromise. See id. Within an hour of asking for clarification, the jury reached a unanimous verdict even though no clarification was provided regarding the law. Here, the fact that the jury indicated it did not understand the question before it, coupled with the quick reversal and decision, indicates that there was a close question of liability. See id. Such a compromise by the jury at that late hour was inappropriate and necessitates a new trial.

### D. The Court's Rulings Regarding the Video Resulted in Undue Surprise and Were Prejudicial to Plaintiff.

Easily the most important piece of evidence in this case was a third-party video of the events that was found on YouTube. See Exhibit 3, Original Video. Defendants, on the day of trial, for the first time produced an altered version of the video and, over Plaintiff's objection, they were allowed to use it. The defendants argued that they had simply lightened the video. However, the defendants had all of discovery to lighten, and produce to Plaintiff, this video but did not. See Davis v. Wells Fargo Bank, 685 F.Supp.2d 838, 842-843 ("Davis") (N.D. Ill. 2010)

6

aff'd sub nom, Estate of Davis v. Wells Fargo Bank, 633 F.3d 529 (7th Cir. 2011). At trial, then, the defendants were allowed to surprise Plaintiff with this new version of the video and attempted to impeach him by pointing out a figure that, previously, had been unrecognizable. "Q. Mr. Viramontes, in the upper left-hand corner, directing your attention there, that's you, isn't it? A. I can't see clearly. It looks like me with the phone, but I'm not – I'm not sure. It looks like me with the phone, but I'm not sure. Q. Okay. **And you've had a chance to review this video, to be clear, right?...You've seen it numerous times, in fact?**" R. 81:16-24 (emphasis added). Had the defendants produced their version of the video earlier, then Plaintiff may have been able to adequately respond to the defendants' arguments. But the defendants did not, and now we know why. Defendants wanted to surprise Plaintiff at trial. Such surprise tactics are exactly what the discovery rules seek to prevent. The defendants should not have been allowed to use evidence that they never produced throughout the life of discovery in this case.

Moreover, the Court also granted the defendants' motion to chop off the, approximately, last ten seconds of the video over Plaintiff's objection. However, the defendants then inappropriately used that redaction to their advantage. The defendants argued that the end of the video that the jury was shown was the end of the video. As such, they argued—rather facetiously—that there was nothing more to the story and, impliedly, if there were the cameraman would have kept recording. "You can tell from looking all around the area at that time that no one was concerned with what other police misconduct was occurring. The video was trying to film a squadrole car – or police car driving down the street. If there was some misconduct that was taking place, everyone's attention would have been focused on that. And that wasn't the case." R. 357:14-20. This, however, was more than just misleading. It was untrue. In those redacted seconds, the cameraman is attempting to record what is happening to

7

Mr. Viramontes but several Chicago Police Officers force him to turn off his camera. Accordingly, the defendants were allowed to create a false impression in the minds of the jury regarding the events of September 23, including their rather uncontroversial ending. This is important, though, because it is during this very time that Mr. Viramontes alleges the defendants' excessive force took place.

The defendants' misuse of the substantially altered video, in addition to the other issues raised in this motion, deprived Plaintiff of his right to a fair trial. Therefore, the Court should grant Plaintiff's motion to dismiss.

### E. Plaintiff's Witnesses Should Not Have Been Barred.

The Court barred both Plaintiff's properly disclosed Rule 26 witnesses, as well as witnesses that were discovered on the eve of trial. As neither set of witnesses should have been barred, the Court should grant Plaintiff's motion for a new trial.

The defendants moved to bar Brenda Rivera and Mari Viramontes from testifying because they claimed that they were not properly disclosed to them. However, contemporaneous evidence from the very beginning of this litigation contradicts the defendants' story. Exhibit 2, 1/30/14 Correspondence. In order to cure any potential defect, the Court gave the defendants leave to depose these two witnesses on the eve of trial. In an attempt to facilitate this process, Plaintiff called both witnesses and set up times for their depositions, and was even able to secure an address for Ms. Viramontes. Exhibit 4, 8/4/14 Correspondence. The defendants subsequently claimed they were unable to serve Ms. Viramontes the subpoena for her deposition although Plaintiff's server had no difficulty serving her trial subpoena.

Prior to the scheduled depositions of Ms. Viramontes and Ms. Rivera, Plaintiff learned of two new witness: Guillermo Viramontes and Veronica Viramontes. When the defendants told

Plaintiff that they had not served any deposition subpoenas for Ms. Rivera or Ms. Mari Viramontes, Plaintiff offered instead to produce Guillermo Viramontes and Veronica Viramontes for the exact dates and times that the foregoing depositions were to take place. The defendants, however, refused to attend. Exhibit 5, Counsel's Response.

After not serving deposition subpoenas for Plaintiff's properly noticed witnesses, then not attending the depositions that the defendants were clearly available to attend for Plaintiff's newly discovered witnesses, the defendants moved to bar all of the witnesses—which the Court granted. Plaintiff was thus unduly prejudiced because of the defendants' strategic decision not to contact any of these witnesses. See R. 354:23-25 ("So where is she? Where is the girlfriend? Where is the girlfriend's aunt? They didn't come because this didn't happen.")

Pursuant to Rule 26, neither Brenda nor Mari should have been barred. See Fed. R. Civ. P. 26. Furthermore, Guillermo and Veronica Viramontes should have been allowed to testify as rebuttal witnesses because as soon as Plaintiff learned about them, the defendants had access to them. See Alexander v. CIT Technology Financing Services, 217 F. Supp. 2d 867, 880 (N.D.Ill. 2002)(deny motion to bar a rebuttal witness from testifying). They were disclosed, and also ready and willing to be deposed at a time the defendants' had set aside for depositions in this case. Accordingly, any such undue surprise or harm was nonexistent. See DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 435 (5th Cir. 2003). Meanwhile, the harm to Plaintiff's case was manifest. See New Burnham Prairie Homes v. Village of Burnham, 910 F.2d 1474, 1482 (7th Cir. 1990). Accordingly, the Court should grant Plaintiff' s motion for a new trial as the cumulative effect of barring these witnesses, along with the foregoing, denied Mr. Viramontes of a fair trial.

### F. The *Gilbert* Instruction Was Unduly Prejudicial, Premature, and Unnecessary.

An erroneous jury instruction in and of itself can be enough to establish a new trial. To gain a new trial, a movant must prove that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error. Krippelz v. Ford Motor Co., 750 F.Supp.2d 938, 942 (N.D.Ill. 2010)(citing NTP, Inc. v. Research In Motion, Ltd.,418 F.3d 1282, 1311-12 (Fed.Cir. 2005)). Here, Plaintiff timely objected and offered an alternative instruction what would have remedied the error. See Dkt. 82. Because the given instruction misstated the law of the case, and therefore the law, the Court should grant Plaintiff's motion for a new trial. See id.

#### 1. The Court's Instruction Did Not Accurately Represent the Law.

It is axiomatic that one cannot be convicted of a crime he has not first been accused of committing. Because the Court directed the jury that Plaintiff had been found guilty of acts for which he was never accused, the Court should grant Plaintiff's motion for a new trial.

The purpose of a criminal complaint is to provide a criminal defendant with notice of the charge that the State seeks to prove against him or her. See People v. Griffin, 36 Ill.2d 430 (Ill. 1967). So, for example, in Griffin, the Supreme Court of Illinois reversed a finding of guilt against a defendant, holding that the criminal complaint merely mirrored the statute and did was insufficient to advice him of the nature of the accusation against him. Id. at 431. There, the Court recognized that the importance of the criminal complaint stating with particularity the charge against an individual is not only to enable him or her to prepare for his defense, but also to act as a bar against the State for attempting to prosecute a person twice for the same offense. Id. at 432(citing People v. Peters, 10 Ill.2d 577, 580 (1957)).

Here, the defendants charged Plaintiff with aggravated assault and the "particular acts relied upon" that formed the basis of that charge was that Mr. Viramontes "knowingly swung back a closed fist" at a Chicago Police Officer. See id.; Exhibit 1, Criminal Complaints. Accordingly, it was clear error to instruct the jury that Mr. Viramontes actively swung at a police officer and missed as part of the *Heck* instruction. See Dkt. 80. He was never charged with swinging at a police officer, so he could not be convicted of having swung at a police officer. To instruct there jury such confused the issues of the case and was unduly prejudicial to the Plaintiff. The purpose of Heck is to prevent the of claims that "necessarily" implies the invalidity of a criminal conviction. See Nelson v. Campbell, 541 U.S. 637, 647 (2004)(stressing the importance of "necessarily" in stating the rule of Heck). As such, the Court's instruction was also overly broad as those facts were not in dispute before the criminal court and, as a result, would not have necessarily made his criminal conviction invalid. For all these reasons, Plaintiff should be granted a new trial.

Similarly, the Court's instruction that Plaintiff actively resisted was defective because it essentially instructed the jury about Plaintiff's conviction—i.e. resisting arrest. See Exhibit 1. Rather, the Court should have instructed the jury regarding the factual predicate: that he pulled his arm away. Id. In so doing, the Court would have provided the narrowest instruction necessary, in line with the Supreme Court's admonition in Nelson, to both preserve the validity of Plaintiff's conviction without forcing Plaintiff to, essentially, confess to the jury. See Nelson, 541 U.S. at 647. This was especially important since the jury was instructed that a plaintiff's resisting arrest can be used to determine whether the force used by the defendants was excessive. See Dkt. 82, p. 21. That said, there is a marked difference between pulling one's arm back— which Plaintiff admitted on the stand and even demonstrated—and the innumerable other

11

machinations that the phrase "actively resisting" calls to mind. By instructing the jury that Plaintiff "actively resisted" as opposed to pull his arm back, the color and tenor of Plaintiff's resistance took an entirely different meaning, to his detriment.

### 2. The Court's Instruction Was Premature.

Furthermore, the Court's Heck instruction was premature. In Gilbert, the Seventh Circuit held that in order to cure a Plaintiff's repeated testimony that contradicted his criminal conviction, the Court should have provided a jury instruction "at the start of trial, as necessary during the evidence, and at the close of the evidence." Gilbert v. Cook, 512 F.3d 899, 902 (2008). Accordingly, any prejudice created by the plaintiff's inconsistent testimony would be cured. See id. Here, however, the jury was instructed prior to Plaintiff ever even testifying. C.f. id. Accordingly, he did not have a chance to "maintain an agnostic position toward his conviction." Id. It was decided for him. In essence, Plaintiff was forced to "confess in open Court" to having swung at a police officer via the Court's jury instructions, a result that is contrary to the meaning and purpose of Gilbert. See id.

### 3. The Court's Instruction Curtailed Plaintiff's Ability to Testify.

And finally, Heck deals with issue preclusion, not testimony. It has no bearing on the admissibility of testimony. See Heck v. Humphrey, 512 U.S. 477 (1994). Although the Seventh Circuit has never squarely decided this issues, other circuits have. In Simpson v. Thomas, the Ninth Circuit found that it had been reversible error for a district court to exclude testimony of the plaintiff in a Section 1983 action as Heck barred. 528 F.3d 685 (9th Cir. 2008). In reaching this conclusion, they recognized that Heck—and all of its progeny—addressed only whether a claim itself is viable, not whether evidence is admissible. Id. at 691. Thus, the defendants could not utilize the decision to bar certain testimony as the Plaintiff was "still entitled to tell the jury

12

the entire story" despite the prior conviction. Id. at 696; see Melton v. Murphy, No. 05 C 366, 2008 WL 2697333 (E.D.Pa July 9, 2008). Accordingly, if the Court was going to give the instruction—which Plaintiff still maintains was premature—then Plaintiff should have at least been allowed to testify regarding his version of the facts unfettered. For each of the foregoing reasons, the Court should grant Plaintiff's motion for a new trial.

### 4. The Court's Instruction Was Prejudicial.

Moreover, there is no fair argument that the error did not have a prejudicial effect. The instruction given by the Court manifestly altered the tenor of Plaintiff's interaction with the defendants. Plaintiff admits to pulling his arm back, and at that time it is indisputable that his fist is clenched around his cell phone—its testified to by the most important witness: the video. While that may technically constitute assault and resistance, the calculus of what would constitute reasonable force in response to those actions is remarkably different than under the instruction given by the Court. Rather, by instructing the jury that reasonableness of the defendants' use of force in response to those actions is remarkably different —as opposed to someone who "actively swung in the direction of a police officer and missed" and then "after he swung…actively resisted the police officers." Dkt. 87, p. 19.

In fact, this even contradicted the defendants' own version of events. At Plaintiff's trial, Defendant Lapadula testified that "As I [was] approaching the Defendant he was kind of hitting his chest and he bladed his stance toward me. Q. What do you mean by bladed his stance? A. Like a fighting stance. Like with shoulder and feet apart, to me it was an aggressive stance. So I attempted to take control of him. At which time he pulled away from me." Trial Transcript 11:4-10. Defendant Lapadula then explains that after Plaintiff pulled away is when he attempted to swing at the defendants. "Q. And what, if anything, did the Defendant do when you grabbed his

13

left wrist? A. He immediately pulled away from me. At which time he actually knocked another female Officer to the ground who I did not know at the time….Q. After the female officer fell to the ground, what did you see the Defendant do? A. The subject drew his arm back balled his fist and attempted to swing at me." Trial Transcript 11:20-12:7.

By not allowing Plaintiff's to argue this point, his case was substantially harmed. Officer Bragiel is able to point herself out on the video. See Exhibit 3, Original Video. Accordingly, we know that at least four officers are holding onto Mr. Viramontes at the time that—according the defendants—he pulls his fist back. See id. Again, the reasonableness of the officers' use of force in response to Plaintiff's actions under these circumstances, as opposed to a one-on-one situation between the defendant and Mr. Viramontes, necessarily requires an entirely different calculus. This is especially true as it speaks to the possible motivations of the parties. Regardless of the extent, or even direction, that Plaintiff's fist moved, he did so after the defendants touched his person; he resisted then swung—not swung and then resisted. In this case, the difference between those two events cannot be understated. If Plaintiff swung first, then he's the first aggressor. If, however, the defendants were trying to rip Plaintiff's phone out of his hand and he pulled back that same fist, then it would also be reasonable to infer that whatever he subsequently did with that first was in response to the defendants' (and others) continued use of force against him. However, as a result of the Court's instruction, Plaintiff was not allowed to point this out to the jury, let alone argue it.

As a result, Plaintiff was not allowed to impeach the defendants. The defendants' criminal trial testimony was not consistent with the video, but the trial court's ruling was consistent with the video. This Court framed its instruction based on the trial court's ruling. Thus, the defendants changed their story to match this Court and the trial court's ruling. "Q. Just

14

to clear up something. When you were attempting – I'm sorry. When you were attempting to pull Mr. Viramontes back, he knocked down Officer Bragiel; is that correct? A. Yes. I never saw him actually knock Officer Bragiel to the ground, but that is what was inferred to me, that he knocked her down during that push/pull. Q. And that's when you later strike him; is that correct? A. Yes, I saw – well, I saw her on the ground, and I saw her get up. Whether or not I struck him in the middle, I – I don't recall."). R. 176:10-20. However, because Plaintiff could not question this Court's ruling, Plaintiff was estopped from questioning the defendants' prior testimony also. The defendants used the Court to bolster their credibility, and Plaintiff was helpless to impeach them. "You are not permitted to directly examine in contradiction, under the case law, and you know that." R. 246:22-23. Numerous objections were sustained on this point, and Plaintiff submits it was unfair to prevent him from impeaching the defendants. "Q. During the criminal trial, isn't it true you did not tell the Court that Mr. Viramontes pulled away after swinging?...You didn't say that Mr. Viramontes pulled away after swinging. THE COURT: I'm going to stop there based upon my prior ruling that that's not going to be answered. You don't need to answer that question." R. 248:18-25. Because such a situation is contrary to notions of justice, and substantially altered the jury's consideration of what would constitute reasonable force, the Court should grant Plaintiff's motion for a new trial.

WHEREFORE the Plaintiff, WILLIAM VIRAMONTES, respectfully requests that this Honorable Court grant his motion for a new trial, and provide any further relief it deems equitable and just.

Respectfully Submitted,

WILLIAM VIRAMONTES

By: s/Jeanette Samuels
One of Plaintiff's Attorneys

Jeanette Samuels
Jared Kosoglad
JARED S. KOSOGLAD, P.C.
118 South Clinton Street
Suite 200
Chicago, Illinois 60661

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he served the foregoing pleading via the Court's electronic filing system on all counsel of record on October 1, 2014.

s/Jeanette Samuels